STATE OF NORTH CAROLINA v. JAMES EVERETT BARNWELL

No. 7230SC671

(Filed 24 January 1973)

1. Constitutional Law § 29; Jury § 7— jury list — absence of persons 18-21 years old

The trial judge in a first degree murder case properly refused to quash the array where the evidence was insufficient to show a systematic and arbitrary exclusion of persons from 18 to 21 years of age from the jury list.

2. Jury § 5— conferences between sheriff and solicitor during jury selection — no prejudice

Conferences among the sheriff, his chief deputy and the solicitor with respect to individual jurors during the jury selection did not constitute a fatal defect in the selection process where there was no allegation or showing that the activity of the sheriff and his deputy resulted in the selection of any juror who was biased or prejudiced against defendant.

3. Homicide § 21— death by shooting — involuntary manslaughter properly submitted to jury

Where defendant's own version of how the shooting occurred presented a jury question as to his guilt of involuntary manslaughter, nonsuit as to that lesser included offense was properly denied.

4. Homicide § 21— second degree murder — sufficiency of evidence on issue of intent

Where the evidence tended to show that deceased was killed by a shot from defendant's shotgun while it was in defendant's hands, that the shooting occurred in a remote mountain area, that defendant was the only eyewitness, that defendant rolled deceased's

299

State v. Barnwell

body off a steep embankment immediately after the shooting, that defendant removed traces of blood from his car and that defendant denied having been in deceased's presence on the night of the shooting, such evidence was sufficient to take the case to the jury on the issue of intent.

5. Criminal Law § 77— self-serving declaration — later incriminating statement — admissibility of one without the other

Defendant's self-serving written declaration dated 27 September 1971 concerning the shooting under consideration and his oral admission to the sheriff on 30 September 1971 that the gun shown him was the gun with which he shot deceased were statements entirely separate and not connected in any way; therefore, it was not error for the trial court to permit the State to place in evidence defendant's statement of 30 September 1971 without also offering his written statement of 27 September 1971.

6. Criminal Law § 33— evidence of presence of attorney with defendant after crime — admissibility

The trial court did not err in permitting testimony that defendant was seen in the presence of his attorney on the morning following the shooting where such evidence was relevant in view of defendant's position that his psychological reaction prevented his acceptance of the fact he was involved in the shooting.

7. Criminal Law § 43; Homicide § 20— photographs of deceased — admissibility for illustative purposes

The trial court did not err in allowing into evidence a photograph of deceased while alive and wearing the same shirt and glasses she wore on the night of her death and a photograph of the body of deceased since the photographs were used by witnesses to illustrate their testimony.

8. Homicide § 24— sufficiency of evidence to support instruction on motive

Though evidence tending to establish motive in a first degree murder case was weak, it was sufficient to justify the court's refusal to charge the jury that there was no evidence at all of motive.

9. Homicide § 21— insufficiency of evidence to require submission of voluntary manslaughter to jury

Where there was no evidence that defendant killed deceased in the heat of passion or in self-defense, the trial court did not err in failing to submit to the jury a possible verdict of voluntary manslaughter.

APPEAL by defendant from *Ervin, Judge,* 17 February 1972 Regular Criminal Session of Superior Court held in JACKSON County.

Defendant was brought to trial upon a bill of indictment charging him with the first degree murder, on 13 September

State  v.  Barnwell

1971, of June Love Barker. At the conclusion of all the evidence, the court allowed defendant's motion for nonsuit as to the capital charge and submitted to the jury the possible verdicts of guilty of second degree murder, guilty of involuntary manslaughter or not guilty. The jury returned a verdict of guilty of second degree murder. Defendant appeals from judgment imposing an active prison sentence of not less than 14 nor more than 20 years.

Evidence offered by the State tends to show the following:

On 13 September 1971, June Love Barker, 22 years of age, and defendant, 24 years of age, were employed as teachers at Sylva-Webster High School in Jackson County. They planned to get married when they received their next paycheck. About 8:00 on the evening of that date, Miss Barker left the home of her parents, where she resided, to meet defendant at the school. About 10:00 p.m. defendant called the Barker home and requested to speak to Miss Barker. When advised that she was supposed to be with him at the school, defendant stated, "I know, I drove my Jeep up there where she could see it, and she never did come, so I come back home." About half an hour later, defendant and his father went to the home of Miss Barker's parents. Defendant asked if Miss Barker had a church meeting, and although advised that she did not and was not dressed for church, he insisted on going to the Tuckasegee Baptist Church, three miles away, to look for her. When he returned with his father, defendant stated: "We finally found her car. When I got to the church, I got thirsty and I asked daddy to drive out to the powerhouse, to the spring, to get a drink of water. . . . Just as we went around the curve, out there by the little lake, we found her car, and it's locked, and I can't understand why June locked her car." The powerhouse, referred to as the Thorpe Powerhouse, is located on N. C. Highway No. 107 three and one-half miles beyond the Tuckasegee Baptist Church. The car was found near Tuckasegee Dam and lake, a short distance from the powerhouse.

Defendant and his father remained at the Barker home until 5:30 a.m. the following morning. During this time defendant appeared upset and incoherent. He took at least four aspirin and vomited once. On two occasions, defendant stated that he would like to know who was riding around the school in a brown Chevelle while he was there.

At approximately 7:50 a.m. on 14 September 1971, an envelope containing a letter addressed to defendant was found on the trail to the spring near the Thorpe Powerhouse. A red substance on the envelope was later identified as human blood. Miss Maureen Gilligan of Granite Falls, Minnesota, testified that she wrote the letter. She said that she met defendant on 6 July 1971 and was acquainted with him for five weeks in Boston where they participated in a summer institute for science teachers. Miss Gilligan stated that she had corresponded with defendant four or five times and that she had also written other members of the institute. When defendant saw the letter in the hands of the sheriff, he shouted, " . . . [W]here did you find that letter?" Defendant later explained to a State's witness that Miss Barker had come into his office on 13 September 1971 while he was reading the letter. He stated that he had told her he had nothing to hide from her; that he would like for her to take the letter home, read it, and that they would discuss it later.

At around 10:00 a.m. on 14 September 1971, defendant went to the lake near where Miss Barker's car was found. The lake was being searched and defendant remarked, "Oh, my God, I hope she's not in that lake." Defendant was later seen at the lake with Tom Jones, a lawyer, and was heard to say that he had Jones with him because he was a friend and as a lawyer had a more trained eye to assist in looking for Miss Barker.

On the afternoon of 14 September 1971, an off-duty highway patrolman was driving north along N. C. Highway #107. Approximately three miles south of the Thorpe Powerhouse, and near the Bo Wilson curve, the officer observed a large red spot in a gravel pulloff on the left shoulder of the road. A smeared red solution led from the red spot across a grassy area and toward an embankment 12 to 13 feet away. Upon further investigation, the officer found the body of Miss Barker at the foot of the bank. She had died from a gunshot wound that entered her body directly below the armpit in the right side and extended through the ribs, heart, one lung, and into the other lung. A physician estimated that she had been dead at least 12 hours.

Deceased's brother asked defendant if he could account for his time between 8:05 and about 10:05 or 10:10 on the night of 13 September 1971. Defendant replied that he could, except

for 45 minutes and that " . . . he would like to see somebody do what had to be done in 45 minutes."

At approximately 9:30 on the evening of 13 September 1971, a big two-tone car with a "big whippin' aerial" on the back bumper was seen parked a few feet off the pavement near the Bo Wilson curve. A person's shoulder was observed leaning against the window on the passenger side. At around 9:45 or 10:00 p.m. on that date, defendant was seen with his car, a 1971 two-tone Buick with a long whip-type antenna attached to the rear bumper, in a self-operated car wash in Sylva. The car wash is about 13 or 14 miles from the Bo Wilson curve. On 22 September 1971, an S.B.I. agent examined defendant's car pursuant to a search warrant. Evidence of blood was found on the left door panel below the armrest and on the outside of the driver's side where the vinyl top joins the metal portion of the body of the automobile.

On 27 September 1971, defendant signed a written statement in the presence of his counsel, the solicitor and the sheriff. On 30 September 1971, one of defendant's attorneys delivered to the sheriff a .12 gauge double barrelled shotgun and the sheriff displayed the gun to defendant on 30 September 1971 and asked him " . . . [I]f this was the gun he shot June Love Barker with?" Defendant replied, "Yes."

Defendant's evidence tended to show the following:

Defendant testified that he was a teacher and an athletic coach at Sylva-Webster High School for a little over two years. He met deceased, a home economics teacher, near the end of the 1970-71 school year. After a period of preliminary dating, they made plans to get married as soon as it was economically possible. The couple met at the school at about 8:30 p.m. on 13 September 1971 to discuss repairing athletic equipment, which was to be a project of deceased's home economics class. They decided to ride up toward Glenville Lake. Deceased was to follow defendant in her car so that it could be left nearer her home. Defendant testified that he had planned to leave deceased's car at the Thorpe Powerhouse in the lighted area. However, he got confused about his distances, and upon realizing that the farther they drove, the farther Miss Barker would have to drive back to her home, he stopped at a major turnoff. Miss Barker parked her car there, locked it, and got into defendant's car. Defendant testified, " . . . I did not know at that time, but as it turned

out later, it was right at the Tuckasegee Dam." The powerhouse was just around the next turn.

The couple joked about defendant having misjudged the distance to the powerhouse, and as they rode along, defendant started talking about the upcoming hunting season and bragging about his shooting ability. He jokingly told deceased that he could hit a can at night by sound. Deceased said, " . . . [Y]ou know, you can't do this sort of thing." They stopped at a pulloff and defendant got his shotgun out of the trunk to demonstrate. He told deceased to pick up a can. Deceased was standing in the area of the open front door on the driver's side and they were joking and laughing. Defendant dropped two shells in the gun and turned toward deceased to tell her to throw the can, ". . . but I never got it said."

Defendant testified further: "I don't know how the gun went off, it just went off. She didn't say anything. . . . In the blast I saw it hit her. I don't know what happened, I called to her, the exact words I don't remember, the only thing I could see was sticking under the door was, well from her ankle down she had on white tennis shoes. That's all I could see. She had fallen in the dark and I reached and I just jerked and the next thing I remember is I hit the ground. We were both over the bank, the exact, how we got there, I don't know. . . . I didn't push her, like, I say, 44 feet. She must have just rolled. I didn't deliberately, I just panicked, that is the only word I know to say. I threw the gun back into the trunk of the car, pulled the keys out of the tailgate and I started down the mountain."

Defendant further testified that he remembered stopping at the powerhouse and walking toward the spring. When he started to get back in the car he saw from the light in the powerhouse area that blood was streaked down the side of his car. In defendant's words, he "just totally lost it." Defendant tried to remove the blood with an athletic sock. He denied remembering the trip to Sylva, but stated that he recalled stopping at the first lighted area that he recognized. This was the Sylva Car Wash. He looked and saw nothing on the car. Defendant stated, "I was scared to death, I was panicky, I just got in the car and went on home." Defendant contended that he had no awareness of his involvement, perhaps because of " . . . the light, the fear and the panic, I don't know." Sometime during the second week following the shooting defendant realized what had happened and made a statement to his attorney on 23

September 1971, the day following the S.B.I. inspection of his car. The statement was later reduced to writing and was signed and delivered to the sheriff on 27 September 1971.

Defendant admitted that he was familiar with the shotgun in question and that he was experienced in the care of weapons. Firearms are one of his hobbies and in September of 1971 he owned 15 to 20 firearms. He stated he assumed he had his fingers on the trigger when the gun discharged and believes both barrels went off.

Defendant denied that his relationship with Maureen Gilligan was anything other than that of a casual friend and presented several witnesses whose testimony tended to support that contention. Defendant also denied that Miss Gilligan's letter, which he had shown to deceased, had upset deceased in any way.

Dr. M. J. Hornowski, a psychiatrist, testified that he consulted with defendant on two occasions in January of 1972 for periods of one hour. Based upon testing and the conferences, Dr. Hornowski made two diagnoses. His first diagnosis was that defendant suffered a severe reactive depression or grief reaction in response to the death of deceased. His second diagnosis was that defendant also suffered a disassociative reaction. The latter was explained as a reaction which causes a person who has experienced a severe injury or trauma to his personality or psychic to experience a splitting off of emotion and reason "until such time as they are able to integrate into their personality the experience that upset them without having a frank psychotic or insane break." In the opinion of Dr. Hornowski, defendant's reactions were triggered by the sight of blood after the shooting, and made defendant " . . . become almost completely paralyzed, insofar as rational thought was concerned." In answer to a hypothetical question, the doctor expressed the opinion that defendant's denial of his involvement in the shooting for a period of some nine days could or might have been caused by his reaction to the events following the shooting.

Defendant presented numerous witnesses who testified as to his good character and reputation in the community. Several witnesses described defendant's general condition and conduct between the time of the shooting and the time he first admitted his involvement. On cross-examination the football coach of

Sylva-Webster High School stated that defendant attended football practice on Wednesday and Thursday following the Monday on which Miss Barker was killed, and that on the Friday following her death, defendant scouted a future football opponent and rendered a good scouting report.

*Attorney General Morgan by Associate Attorney Maddox and Associate Attorney Baxter for the State.*

*Coward, Coward & Jones by Thomas W. Jones and Riddle and Shackelford by Robert E. Riddle for defendant appellant.*

GRAHAM, Judge.

[1] On 9 February 1972, eight days before the beginning of the trial, Judge Ervin ordered that a special venire of three hundred jurymen be drawn from Cherokee County. The order recited that attorneys for defendant and the solicitor agreed " . . . that because of the widespread publicity and discussion of said case in Jackson County and because the alleged victim was a resident of Jackson County, and the accused is a resident of Jackson County, that it would be virtually impossible to select a jury from within Jackson County." The order was consented to by defendant and the State and provided that the proper authorities of Cherokee County furnish defendant's counsel a copy of the venire selected as soon as it was drawn.

At the opening of court, defendant, through counsel, challenged the jury array. No grounds were stated for the challenge and the only evidence offered in support thereof was testimony by the sheriff of Cherokee County. Defendant's counsel examined the sheriff concerning the method used to summons the jurors, but did not question him about the source of the names of the prospective jurors, or about the method used to compile the jury list in Cherokee County. In response to a question concerning 18 year olds, however, the sheriff expressed an opinion that "[t]hey just haven't had time to comply with the new law . . there is no young people in there." Defendant says that this statement by the sheriff required the trial judge to quash the array for the reason it did not contain persons in the age group of 18 to 21. We disagree.

In 1971 the General Assembly amended G.S. 9-3, effective 21 July 1971, reducing the minimum age for persons qualified to serve as jurors from 21 to 18. However, an absence from jury

State v. Barnwell

lists of the names of persons between the ages of 18 and 21 for a short period of time after the effective date of the amendment is not unreasonable, and does not constitute systematic and arbitrary exclusion of this age group from jury service. *State v. Cornell,* 281 N.C. 20, 187 S.E. 2d 768; *State v. Harris,* 281 N.C. 542, 189 S.E. 2d 249; *State v. Kirby,* 15 N.C. App. 480, 190 S.E. 2d 320; *State v. Long,* 14 N.C. App. 508, 188 S.E. 2d 690. Conceding *arguendo* that the time involved here was reasonably sufficient to permit the jury commission to restructure its lists so as not to improperly exclude any group of eligible persons, we are of the opinion that the evidence offered was insufficient to show that the commission failed to do so. Under G.S. 9-2, the jury commission was required, at least 30 days before 1 January 1972, to prepare a list of prospective jurors qualified to serve in the ensuing biennium. The casual opinion expressed by the sheriff is insufficient to show that the jury commission failed to perform this statutory duty, or that in doing so, it systematically excluded persons of any age group. Unless there has been a systematic exclusion, defendant has no right to complain. *See State v. Spencer,* 276 N.C. 535, 173 S.E. 2d 765, and the cases cited therein.

[2]   After the jury was selected the sheriff of Cherokee County was questioned by defendant's counsel about having assisted the solicitor during the selection process. The sheriff admitted that he and his chief deputy sat near the solicitor while the jury was being selected and conferred with him about individual jurors. Defendant contends this constitutes a fatal defect in the jury selection process. However, it is not alleged, nor does the record show, that the activity of the sheriff and his deputy resulted in the selection of any juror who was biased or prejudiced against defendant. In *State v. Perry,* 277 N.C. 174, 176 S.E. 2d 729, the defendant complained about the method of jury selection. In rejecting his complaint, the Supreme Court noted that the panel did not contain any juror to which defendant had objection. The same is true here. Defendant does not allege that he exhausted his preemptory challenges. This assignment of error is overruled.

Defendant assigns as error the denial of his motion for nonsuit made at the conclusion of the State's evidence and renewed at the close of all of the evidence.

[3]   Defendant's own version of how the shooting occurred presents a question for the jury as to his guilt of involuntary

manslaughter and nonsuit as to that lesser included offense was clearly not warranted. "It seems that, with a few exceptions, it may be said that every unintentional killing of a human being proximately caused by a wanton or reckless use of firearms, in the absence of intent to discharge the weapon . . . and under circumstances not evidencing a heart devoid of a sense of social duty, is involuntary manslaughter." *State v. Foust*, 258 N.C. 453, 459, 128 S.E. 2d 889, 893.

[4] The question of whether the evidence was sufficient to support a second degree murder charge presents more difficulty. An unlawful killing with malice is murder in the second degree, and when it is shown that a defendant intentionally shot the deceased with a deadly weapon and thereby caused his death, presumptions arise that the killing was unlawful and that it was done with malice. *State v. Barrow*, 276 N.C. 381, 172 S.E. 2d 512. However, for the presumptions of malice and unlawfulness to arise from a killing with a deadly weapon, the defendant must admit or the State must prove beyond a reasonable doubt that the killing was intentional. *State v. Woods*, 278 N.C. 210, 179 S.E. 2d 358. Defendant strenuously contends that the evidence here will not support a finding that he intentionally shot deceased. While there is no direct evidence of intent, we are of the opinion and so hold that the circumstances shown by the State, when considered together, were sufficient to take the case to the jury on this issue.

When considered in the light most favorable to the State, the evidence tends to show that deceased was killed by a shot from defendant's shotgun, while it was in defendant's hands. The shooting occurred in a remote mountain area. There were no eyewitnesses other than defendant. Defendant immediately rolled the body of deceased some 12 to 13 feet and off a steep embankment. He removed traces of blood from his car, denied repeatedly for nine days that he had been in deceased's presence on the night she was killed, and sought through various statements to remove suspicion that he might have some knowledge of the shooting. It was only after the investigation of law enforcement officers pointed convincingly to defendant as a suspect that he conceded any involvement in the tragedy. His exculpatory statement that the shooting was an accident was not a part of the State's evidence. Intent can seldom be proved by direct evidence, and only defendant knows beyond all doubt the condition of his mind when the shotgun discharged and ended the life of the girl he contends he planned to marry.

But the circumstances surrounding the shooting, and defendant's conduct at that time and subsequently, will support a reasonable inference that the shooting was intentional. Ordinarily, intent must be shown, if at all, by circumstances from which it may be inferred. 2 Strong, N. C. Index 2d, Criminal Law, § 2, and cases cited.

[5] Defendant assigns as error the precluding of questions asked the sheriff on cross-examination about the written statement of 27 September 1971. His position is that his oral admission to the sheriff on 30 September 1971 that the gun shown him was the gun with which he shot deceased was a connected and an integral part of his exculpatory written statement of 27 September 1971. Ordinarily, when the prosecution introduces a part of a confession, the defendant may bring out on cross-examination all that was said, including any statements favorable to him. *See State v. Fowler,* 230 N.C. 470, 53 S.E. 2d 853; *State v. Patterson,* 63 N.C. 520, Annot., 2 A.L.R. 1017 (1919), Annot., 26 A.L.R. 541 (1923).

A *voir dire* examination was held to determine the connection, if any, between defendant's written statement of 27 September 1971, and his concession regarding the gun, made on 30 September 1971. The court made extensive findings of fact, including findings that had the sheriff not received the statement of 27 September 1971, and had defendant's counsel not delivered the shotgun to him, the sheriff would have continued his efforts to find the gun which he had reasonable cause to believe was used in inflicting the fatal wound. From these and other findings, all of which are supported by evidence elicited on *voir dire,* the court concluded that the two statements were entirely separate and not connected in any way. This conclusion is supported by the findings, and we therefore hold that it was not error to permit the State to place in evidence defendant's statement of 30 September 1971 without also offering his written statement of 27 September 1971, or to prohibit defendant's various attempts to get his self-serving declarations of 27 September 1971 before the jury through cross-examination of the sheriff.

[6] Defendant insists that the court erred in permitting testimony that he was seen in the presence of his attorney on the morning following the shooting. This evidence was relevant in view of defendant's position that his psychological reaction prevented his acceptance of the fact he was involved in the

shooting. There is no suggestion in the record that any accusation had been made against defendant at the time he sought the attorney to accompany him to the area where a search was in progress for deceased. While certainly no inference of guilt should arise from the presence of the attorney, the fact defendant was mentally capable of seeking his attorney's assistance has some bearing on the question of whether his contentions regarding his mental state on that occasion are accurate.

[7] Miss Barker's mother testified that her daughter was wearing a long-sleeved blue shirt, blue jeans, and glasses with navy blue frames when she left home on the evening of 13 September 1971. She was permitted, over defendant's objection, to illustrate her testimony by reference to a photograph taken of deceased while alive and wearing the same shirt and glasses that she wore on the night of her death. The introduction of this photograph in evidence over defendant's objection is assigned as error. The glasses and shirt identified by the witness were later introduced in evidence. "As a general rule, photographs are competent to be used for the purpose of illustrating anything it is competent for the witness to describe in words." *Smith v. Dean,* 2 N.C. App. 553, 563, 163 S.E. 2d 551, 557. There was no error in the admission of this photograph or in the admission of a photograph of the body of deceased, which is also the subject of an assignment of error. The photograph of deceased's body was used by physicians to illustrate their testimony as to the position of the gunshot wound on the body and was admissible for this purpose. See *State v. Frazier,* 280 N.C. 181, 185 S.E. 2d 652, and cases cited.

Defendant brings forward and argues several assignments of error which challenge the admission of the testimony of various witnesses tending to place defendant at the scene of the shooting and connect him therewith. In view of defendant's defense which concedes that he was present at the scene but contends the shooting was an accident, it is difficult to see how he could be prejudiced by any of this testimony. We have nevertheless examined each of these assignments of error and find them without merit.

The final three assignments of error brought forward, all having to do with the court's charge to the jury, are overruled.

[8] Defendant says the court erred in refusing to instruct the jury, as requested in writing, that the State had failed to show

a motive for the killing and that the absence of evidence of a motive is "a circumstance which you should consider bearing on the innocence of the defendant." Motive is not an essential element of murder, G.S. 14-17. However, "[w]hile not necessary to be proven, motive or the absence of motive is a circumstance to be considered." *State v. Coffey,* 228 N.C. 119, 127, 44 S.E. 2d 886, 892. The State undertook to show a motive with evidence that defendant, while engaged to be married to deceased, was closely associated with Maureen Gilligan for a period of five weeks shortly before the shooting, corresponded with her, and received a letter from her on the day deceased was killed. Defendant apparently considered his relationship with Miss Gilligan important enough to call it to the attention of deceased by showing her a letter from Miss Gilligan and telling her that they would "discuss it later." The letter, found stained with blood on the morning after the shooting, was admitted in evidence. Various inferences may be legitimately drawn from its contents, including an inference that Miss Gilligan was unaware defendant was planning to marry June Love Barker, and that the relationship between defendant and Miss Gilligan was much closer than defendant contended. Although evidence tending to establish motive was weak, we think it was sufficient to justify the court's refusal to charge the jury that there was no evidence at all of motive.

Secondly, defendant says there was no evidence to support certain portions of the court's charge on the issue of involuntary manslaughter. We disagree. Furthermore, the jury did not reach the issue of involuntary manslaughter.

[9] Finally, defendant complains of the failure of the court to submit to the jury a possible verdict of voluntary manslaughter. There was no evidence that defendant killed deceased in the heat of passion or in self-defense. Indeed, he makes no contention that he did. Consequently, the issue of defendant's guilt of voluntary manslaughter does not arise. *State v. Moore,* 275 N.C. 198, 166 S.E. 2d 652.

It is apparent from the record that defendant was ably represented at the trial by skillful counsel of his own choosing. His appeal has been well presented and ably argued. In our opinion he has had a fair trial free from prejudicial error.

No error.

Judges HEDRICK and VAUGHN concur.