Bobby Joe **WILLIAMS**, and Allen Clayburn Justus, Appellants,

v.

The **STATE** of Oklahoma, Appellee.

Nos. F–74–648, F–74–650.

Court of Criminal Appeals of Oklahoma.

Sept. 17, 1975.

Rehearing Denied Nov. 25, 1975.

562

R. L. Weldon and H. A. Leatherman, Oklahoma City, for Bobby Joe Williams.

Don Anderson, Public Defender, Oklahoma County, for Allen Clayburn Justus.

Phillip F. Horning, Oklahoma City, American Civil Liberties Union of Oklahoma, amicus curiae.

Jack Greenberg, James M. Nabrit, III, Peggy C. Davis, David Evan Kendall, New York City, Anthony G. Amsterdam, Stanford, Cal., Legal Defense & Educational Fund, Inc., amicus curiae

Larry Derryberry, Atty. Gen., Bill Bruce, Asst. Atty. Gen., for appellee.

OPINION

BUSSEY, Judge:

Appellants, Bobby Joe Williams and Allen Clayburn Justus, hereinafter referred to as defendants, were charged, tried and convicted in the District Court, Oklahoma County, Case No. CRF–73–3181, for the offense of First Degree Murder, in violation of 21 O.S.Supp. 1974, § 701.1, ¶ 2. In accordance with the provisions of 21 O.S. Supp. 1974, § 701.3, the defendants were thereafter sentenced to suffer death, and from each judgment and sentence a timely appeal was perfected to this Court in respective Case Nos. F–74–648 and F–74–650, which have been consolidated for review.

At the trial, Adam Knight, a Detective with the Oklahoma City Police Department, testified that at about 4:30 a m. on October 30, 1973, he was dispatched to an all night convenience store known as Tom's Market at 1501 South Pennsylvania in Oklahoma City, Oklahoma County, Oklahoma. He there observed the dead body of a white female lying in a prone position behind the counter, and also noted that the cash register was open and empty of money. He later learned the name of the deceased to be Cherry Lee Kennedy, and State's Exhibit No. 3 was admitted after being identified as a picture of the deceased as first observed by the witness. When later recalled, the witness testified he was present that same day when Dr. Keen of the Medical Examiner's Office performed an autopsy upon the body and removed a projectile which was released to Officer Connelly. When later recalled a

second time, he further testified that he participated in the arrest of defendant Williams on November 2, 1973, and State's Exhibit No. 2A was admitted into evidence upon being identified as a statement which that defendant gave and executed regarding the alleged offense after being advised of his rights on November 5, 1973. The most pertinent part of that statement was read to the jury as follows:

"Question: Would you relate to me in your own words to your part in the above homicide?

"Answer: Allan Justus and I was sitting by the Fina Service Station by S.W. 59th and High. I was going to go in there masked and rob him. But there was too much traffic. So we decided not to do it. We were on our way back home and I remembered a store that could be hit. While we were on our way we was talking about it. Allan said that killing someone was the easiest thing in the world to do and get away with it.

"He said if I was to go in the store unmasked that no one would suspect it was being robbed. No one would ever know about it because there wouldn't be any witnesses. We stopped at the store, I went in, told her to put the money in the sack, she did so and I was grabbing some cigarettes with one hand and had the gun in my left hand, when I was trying to put the Marlboro cigarettes in my left hand and the gun in my right hand, the gun accidentally went off. I think it shot her and after that I just started shooting her until it wouldn't shoot anymore and ran back to the car, we started going down deadend streets and I threw the gun outside the car and we went home.

"Question: Bobby, how much money taken in the above robbery?

"Answer: I believe about $30." (Tr. 392–393)

Harrison H. Latham identified State's Exhibit No. 4 as a .22 caliber revolver that he sold to defendant Williams for $30.00 at a swap shop on October 20, 1973. He further testified that he had previously purchased the gun from one Elmer Dempsey, and had not registered the gun with the Oklahoma City Police Department.

William Embery identified State's Exhibit No. 4 as the gun he found on the evening of October 30, 1973, in the 2200 block of South Brookline. He then took the gun home nearby, and his father contacted the police who came and took the gun.

Kenneth James Hahn, a supervisor for Tom's Market, Inc., testified that on October 30, 1973, Cherry Lee Kennedy had operated the store in the 1500 block of South Pennsylvania since 11:00 p. m. the previous evening. He arrived at the store at about 5:30 a. m. that day and observed her body behind the counter before being removed, and a large amount of blood on the floor. He also noticed the cash register was empty and determined that about $32.-00 was missing.

Sergeant Doyal Connelly of the Oklahoma City Police Department testified that he received a bullet from Dr. Phillip Keen and delivered it to Ray Lambert of the Oklahoma State Bureau of Investigation on October 30, 1973.

Ray Lambert of the Oklahoma State Bureau of Investigation appeared as a firearms and ballistics expert. He identified State's Exhibit No. 4 as a gun he had received from Officer Kirby, and testified to receiving a spent bullet from Officer Connelly on October 30, 1973. He then expressed the opinion that based upon his examination this bullet had been fired from State's Exhibit No. 4. When later recalled, this witness identified State's Exhibit No. 5 as containing both the bullet previously mentioned and the bullet that he had test fired from State's Exhibit No. 4 for use in microscopic comparison.

Officer Denver Kirby of the Oklahoma City Police Department identified State's Exhibit No. 4 as the gun he had received from Sergeant Upchurch of that same de-

partment, and delivered to Ray Lambert of the Oklahoma State Bureau of Investigation on or about October 31, 1973.

Officer Ron McKinney of the Oklahoma City Police Department identified State's Exhibit No. 4 as the gun delivered to him by William Embery on the afternoon of October 30, 1973, and which he shortly thereafter released to John Hill, a lab technician with the Police Department.

Officer John G. Hill of the Oklahoma City Police Department identified State's Exhibit No. 4 as the gun he had received from Officer McKinney on October 30, 1973. After processing the gun and determining the registered owner to be one Elmer Dempsey, the witness secured the exhibit in a locked cabinet at the Police Department. The gun was then admitted into evidence.

Dr. Phillip Keen, a Medical Examiner and forensic pathologist with the Office of the Chief Medical Examiner for the State of Oklahoma, testified that he performed an autopsy upon the body of Cherry Lee Kennedy on October 30, 1973, and determined the cause of death to be a gunshot wound to the head. The witness observed a bullet wound to the left leg, another at the top of the head in the right temple, and a third to the left shoulder which then entered the left cheek and lodged behind the right jaw. The latter bullet was recovered and released to Officer Connelly of the Oklahoma City Police Department. State's Exhibit No. 5 was then admitted into evidence.

Officer Bob J. Coffia, assigned to the Special Services Division of the Oklahoma City Police Department, testified that he was trained in the use of video tape equipment, and identified State's Exhibit No. 1 as a video tape portraying an interrogation of defendant Justus which he made at the Oklahoma City Police Department on November 3, 1973. This video tape was then admitted into evidence and exhibited to the jury.

In this video tape statement defendant Justus was first advised of his rights and then acknowledged the same by executing a waiver of rights form. Regarding the subject offense, he then related that at about 3:30 to 3:45 a. m. on the night thereof, he and defendant Williams were riding around in the car of defendant Justus looking for someone, or something, to hit when his co-defendant directed him to Tom's Market. He did not personally favor this location, but defendant Williams was familiar with the store and had observed quite a bit of money there. He parked the car on the north side of the store with the engine running and defendant Williams entered the store with a gun and wearing gloves. While in the car, he heard four shots, and interjected that there were not supposed to be any shots fired but only a robbery. Defendant Williams then came running out with two cartons of Marlboro cigarettes and a bag of money, and said that he had shot her once in the hip and three times in the face and he was sure she was dead. While fleeing the neighborhood in his car, they then kept running into deadend streets. Defendant Williams asked him what should be done with the gun, and upon his advice defendant Williams then wiped the gun and threw it from the car while he was watching the road and looking for police cars. They then drove home and evenly split the money, estimated at $32.00 plus some change, and each took one of the two cartons of cigarettes. When arrested, each defendant had one package of Marlboro cigarettes, and he stated that these came from those cartons taken in the robbery. Defendant Justus further described and identified the gun used in the robbery, and explained that he had recommended the gun to defendant Williams when his co-defendant purchased it at a swap meet, and that he thereafter fired the gun in target practice.

The final witness in chief for the State was Detective Jerry Guinn of the Oklahoma City Police Department who testified

that he also participated in the arrest of both defendants on November 2, 1973, and thereafter interrogated defendant Justus after advising him of his rights in the video tape marked as State's Exhibit No. 1, during which that defendant identified State's Exhibit No. 4 as the gun therein discussed.

Defendant Williams next took the witness stand in his own defense. Insofar as his testimony was responsive to the evidence of the State and the issues presented, he admitted to having purchased the subject gun but claimed to have traded it to one Alton Oliver (Cooper) on October 28 or 29. He also denied any participation in the crime and any knowledge thereof, and asserted that the confession was signed after he had previously requested an attorney and without knowledge of the contents thereof because Detective Knight threatened to rearrest Gayle Kimbrough, the woman with whom this defendant had been living, and because Detective Knight had indicated that he would protect her from friends of defendant Justus if he would sign the instrument. He explained that Gayle Kimbrough was seven months pregnant and had been taken into custoy in connection with this offense on the same night that he had previously been arrested, and claimed that she had been mistreated by the officers calling her names and telling her that the baby would be born in jail. Although he knew that signing the instrument would involve him in the crime, he testified that at the time he did not know this to be a confession, and the contents thereof were not his statements. He further testified that shortly before defendant Justus made his video tape statement on November 3, he gave a video tape statement implicating defendant Justus because the authorities told him that they would release himself and Gayle Kimbrough, and an Assistant District Attorney gave him a piece of paper wherein he expressed his agreement not to prosecute him for purchasing a gun as a felon if he would testify against defendant Justus. He also admitted prior convictions for embezzlement and a Federal stolen automobile charge.

In cross-examination by the State, defendant Williams testified that Gayle Kimbrough was legally married, and that her husband was in the military service overseas. He claimed that at the time of the crime he was at home with Gayle Kimbrough and her children, and that he had given the piece of paper he had received from the Assistant District Attorney to Gayle Kimbrough or her mother at the police station. He admitted telling Detective Knight that he knew the crime was going to happen, but said that this had been a lie. He also testified that defendant Justus was with him when the gun was purchased and had commented that it was a good gun. In cross-examination on behalf of defendant Justus, he testified that he had implicated that defendant because detective Knight wanted him to and that to his knowledge defendant Justus had not been involved in the offense.

Ed McConnel, an attorney, next testified that at the request of the sister of defendant Williams he consulted with him in jail on the evening of November 5, 1973, and found the defendant to be quite distraught and unresponsive.

Gayle Kimbrough then testified and insofar as pertinent here generally confirmed her relationship with defendant Williams and his account of the circumstances surrounding her arrest and detention.

Patricia Choate testified as the final defense witness for defendant Williams that she was the mother of Gayle Kimbrough, and that while at the Oklahoma City Police Department defendant Williams gave her a piece of paper signed by the Assistant District Attorney. She had not looked for the paper, but thought that it was at home.

Defendant Justus next testified in his own behalf that he was threatened and coerced into making the video tape confession after being coached and while under the influence of LSD. He denied any participation in the crime, and asserted that

he was home with his wife and son at the time of the offense. This defendant explained that he had taken one hit or pill of LSD shortly before his arrest, and swallowed the remaining eight pills just prior to his arrest to keep from being caught with them. Despite his repeated requests for an attorney, he was thereafter questioned several times. After viewing a video tape statement made by defendant Williams and while still under the influence of the LSD, he agreed to give his video tape confession after Detective Knight had threatened him with a gun and repeatedly prepared him as to what to say. He admitted being with defendant Williams when the gun was purchased, but prior to his arrest claimed to have last seen the gun when defendant Williams gave it to Alton Oliver. He also admitted prior convictions for second degree forgery, attempted larceny of an automobile, and a Dyer Act violation when a juvenile.

Jimmy Justus next testified that he was the father of defendant Justus, and that in response to a telephone call from Detective Knight he visited his son at the Police Department after midnight on the day of his arrest. He described his son as then being "real glassy-eyed, and his speech was rather slow at times, and he would roll his eyes back in his head every once in awhile." (Tr. 554) He further testified that Detective Knight told him a murder had been committed and, although they did not believe his son was involved, they wanted him to use his influence with his son to determine what knowledge he might have of the matter.

Barbara Justus then testified as the final defense witness then she was the wife of defendant Justus and confirmed that he was home with her at the time of the crime. She had also been arrested as an accessory to the murder on the same day that her husband was arrested, and when she first talked with him at the Police Department he told her that they did not have to·say anything because he had already asked for a lawyer. On further examina-

tion she testified that the next day she verified a statement that her husband had made implicating himself in the crime, but that she had lied because her husband had begged her to verify his statement stating that he had been threatened and if she didn't he would not make it out of the City Jail.

In rebuttal, Elizabeth Huff, a report clerk for the Oklahoma City Police Department, testified that she prepared the statement of defendant Williams after he was read his rights from that instrument, typing the questions and answers between Detective Knight and that defendant word for word. Defendant Williams was then asked to read the statement and initial the encircled typographical errors, which he did in addition to signing the instrument.

Jerry Guinn was then recalled and testified that after defendant Justus gave his video tape statement his wife was brought in at his request, and that defendant then told her he had made a full and truthful statement and he wanted her to do the same.

Adam Knight was then recalled and testified that he never rehearsed defendant Justus to give a statement nor threatened him with a gun.

Officer Larry Upchurch was then called as the final rebuttal witness and denied the previous assertion of Gayle Kimbrough that he had mistreated her by dragging her about.

The State then rested rebuttal and no evidence in surrebuttal was offered in behalf of the defendants.

In their first assignment of error, each defendant contends that the death sentence cannot be imposed because the jury "was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction," in violation of *Witherspoon v. Illinois,* 391 U.S. 510, 522, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776 (1968), and other resulting decisions. This contention is prin-

cipally based upon the exclusion of Mrs. Angel, however, mention is also made of the challenge against Mr. Hall, and of those empanelled, these were the only two veniremen to be excused because they were opposed to capital punishment. The pertinent voir dire examination of these veniremen is set forth in the Appendix hereto attached.

In the recent case of *Justus v. State*, Okl.Cr., 542 P.2d 598 (1975), however, this Court held that the applicability of *Witherspoon* was limited to those cases where, upon conviction for the offense charged, the jury has discretion to resolve whether the defendant shall suffer death or some lesser degree of punishment, and under the provisions of 21 O.S.Supp.1974, § 701.1 et seq., see infra, we observed that:

". . . The people have, through the Legislature, predetermined that such offenses are proper cases for the exclusive assessment of capital punishment, and the pertinent voir dire inquiry is whether in view thereof, the veniremen can deliberate upon the evidence impartially under the law and assess such punishment should guilt be established beyond a reasonable doubt."

Pursuant to the provisions of 22 O.S.1971, §§ 659, ¶ 2 and 660, ¶ 8, we further held in *Justus* that the appropriate basis for challenge may be for implied bias or actual bias to the extent that the personal scruples or opinions of a venireman will not yield to the law as enacted by the Legislature. Clearly, the examination of Mr. Hall established that he was so opposed to capital punishment that he could not, in any case, agree to a verdict imposing the death penalty, irrespective of the law and even assuming the State were to prove the defendant guilty beyond a reasonable doubt. The examination of Mrs. Angel unquestionably reveals that she had personal reservations concerning the death penalty, and that she vascillated regarding her capacity to set those reservations aside and otherwise be a fair and impartial juror.

However, the voir dire of Mrs. Angel in this regard was extensive, and she was not excused until the conclusion became apparent that at best she did not know whether she could apply the law to the evidence and honor the oath of a juror in this case. We, therefore, find this proposition to be without merit, and in support thereof adopt the following language from *Justus*:

"We are of the opinion that a challenge for cause is appropriate to the extent that the venireman is equivocal and uncertain regarding his capacity to follow the law and honor the oath of a juror. . . . Clearly, no prospective juror with animosity concerning the death penalty should be excused upon this basis if able to set aside personal beliefs or attitudes and fulfill the oath to try the case impartially according to the law and the evidence. However, if satisfied of the defendant's guilt beyond a reasonable doubt, a venireman is unresolved as to whether he could then assess the death penalty, or knowing the death penalty to be mandatory upon conviction, he is uncertain whether he could stand indifferent between the defendant and the State in deliberating his verdict according to the law and the evidence, then he has to that extent forewarned the court that he is undecided whether he could comply with the oath of a juror. A challenge for cause should be granted against such a venireman, for otherwise the administration of the oath would be frivolous. We agree with the cogent argument of the State that the trial court should not accept a juror who does not know whether he can follow the law, and that to do otherwise would create chaos and make our system of jurisprudence a mockery based upon the personal whims of individuals. The State, as well as the defendant, is entitled to a fair and impartial jury. . . ."

Defendant Williams next raises six assignments of error, numbered two through seven, not presented by the Brief of defendant Justus. In his second assignment

of error, defendant Williams contends that his confession, State's Exhibit No. 2A, was improperly admitted into evidence because the trial court failed to adequately determine and rule upon the voluntariness thereof, and the evidence presented to the trial court established the same to have been executed involuntarily under coercion.

Following the empanelling of the jury and prior to the opening statement of the State, the trial court conducted an evidentiary hearing, outside the presence of the jury, regarding the admissibility of the confession of each defendant. In regard to the confession of defendant Williams, Detective Knight testified that defendant Williams was arrested at about 4:30 p. m. on a Friday, and executed State's Exhibit No. 2 at about 6:30 p. m. the following Monday after the subject charges were filed earlier that day. He further testified that this interview was initiated at the request of that defendant, and, after being advised of his rights as contained in that exhibit and reading them himself, the defendant gave that statement which was transcribed by a stenographer and signed by the defendant. During this four-day period, Detective Knight explained that defendant Williams was interrogated a total of four times, but that these concerned several other offenses and very little time dealt with the subject offense. Defendant Williams then testified essentially as above set forth with regard to this confession. Marie Drayson, mother of defendant Williams, testified as the final witness that her son telephoned her on the day of his arrest and advised her that he was in custody charged with murder, but did not request that she get him a lawyer, and that when she then telephoned the jail she was refused permission to see her son. After ordering the deletion of the reference to another and distinct offense, and permitting the substitution of State's Exhibit No. 2A for State's Exhibit No. 2, as so modified, the trial court then overruled a Motion to Suppress the confession wherein defendant Williams asserted that

he had not knowingly, voluntarily, and intelligently made the same with the benefits of his Miranda rights. In so ruling, the trial court stated in part:

"THE COURT: I will take up State's Exhibit No. 2 to start with. It's a purportedly signed confession of the Defendant Williams. It is my understanding of the law that the question is: Was it voluntary? And No. 2: Was it given after being admonished of their rights in the Miranda decision of the United States Supreme Court? Now, we have one testimony of the officer and the instrument itself, was that they did advise him, that he was advised. And that he signed it freely, and voluntarily after the Miranda warning that he testified that he gave to the Defendant, in the face of the statement itself said he was advised, plus the fact that Defendant Williams said himself that he signed the statement.

"From the Defendant's point of view of this statement, they say it was not voluntary, that he did not read it, he didn't understand it, he didn't know what he was signing, that he had signed it to keep this lady, his common-law wife, and fiance, out of jail, . . .

". . . He has testified that he didn't understand it, it was against his will, and so forth. I think that makes it a question of fact for the Jury to decide: The voluntary statement, whether it's voluntary or not. *I don't find under the evidence in this case that as a matter of law, that it is unvoluntary (sic) statement.* [Emphasis added]

"You have a conflict between the statement itself, testimony of the officer, and the testimony of the Defendant. So I will leave that up to the Jury to decide as to whether or not under proper instructions, whether it's voluntary.

"If the Jury finds that the statement is not voluntary, then they will be instructed to disregard it. If they do, under the law as you gentlemen know, they can consider it. But I think you have a

question of fact to be determined by the Jury, not by the Court. . . ." (Tr. 308–310)

Regarding the sufficiency of the ruling by the trial court, the defendant relies upon *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). However, that decision was analyzed in this regard in *Tice v. State,* Okl.Cr., 478 P.2d 916, 919–920 (1971), as follows:

"[T]he crux of these arguments poses the question of whether the hearing and judge's ruling were in accordance with the requirements of *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908.

"In *Jackson,* supra, we find the following pertinent language in Footnote 8, referring to the Massachusetts rule, which has long been followed by the courts of this state:

" 'We raise no question here concerning the Massachusetts procedure. In jurisdictions following this rule, the judge hears the confession evidence, himself resolves evidentiary conflicts and gives his own answer to coercion issue, rejecting confessions he deems involuntary and admitting only those he believes voluntary. It is only the latter confessions that are heard by the jury, which may then, under this procedure, disagree with the judge, find the confession involuntary and ignore it. Given the integrity of the preliminary proceedings before the judge, the Massachusetts procedure does not, in our opinion, pose hazards to the rights of a defendant. While no more will be known about the views of the jury than under the New York rule, the jury does not hear all confessions where there is a fair question of voluntariness, but only those which a judge actually and independently determines to be voluntary, based upon all of the evidence. The judge's consideration of voluntariness is carried out separate and aside from issues of the reliability of the confession and the guilt or innocence of the accused and without regard to the fact the issue may again be raised before the jury if decided against the defendant. The record will show the judge's conclusions in this regard and his findings upon the underlying facts may be express or *ascertainable from the record.*' (Emphasis added].

\* \* \* \* \* \*

"In the instant case a hearing was conducted outside the presence of the jury at which conflicting evidence was offered and while the trial court did not set forth his ruling as to the voluntary nature of the confession in precise language, it is readily apparent in overruling the Motion to Suppress that he considered the confession voluntary and admissible and as such was a proper matter for the jury's consideration under the prior decisions of this Court. See *Brewer v. State,* Okl.Cr., 414 P.2d 559." (Footnote omitted)

Although the trial court here could have more distinctly expressed his independent determination that the confession was voluntary, in view of the grounds upon which the Motion to Suppress was urged, we are of the opinion that the conclusion of the trial court in this regard is clearly ascertainable from the record. We reach this conclusion on the evidence adduced during the in camera hearing, coupled with the judge's affirmative statement: "I don't find under the evidence in this case that as a matter of law, that it is unvoluntary [sic] statement."

With regard to the sufficiency of the evidence presented at the above hearing, defendant Williams does not contend that he was inadequately advised of his rights or failed to comprehend the same, but argues that he was subjected to repeated questioning over long hours while in custody and coerced to execute the confession on threat of Gayle Kimbrough being rearrested. In support of this argument, he cites *Brown v. State,* Okl.Cr., 384 P.2d 54 (1963). However, that case is readily distinguishable as the proof there

was clear and uncontroverted that the accused had been subjected to severe beatings. Neither the evidence adduced at this hearing, nor the record as a whole, supports the contention that this defendant was subjected to repeated questioning over long hours. He was not actually incarcerated until outside regular court hours on Friday, November 2, 1973. These charges were thereafter filed and a warrant issued on the first day the court was regularly open the following Monday, and the confession was executed that evening. The defendant then had his initial appearance before the trial court the following day. In *Fred v. State,* Okl.Cr., 531 P.2d 1038, 1046 (1975), this Court stated:

"[M]ere delay in arraignment of a prisoner will not render the statement or confession involuntary, nor inadmissible, if it is otherwise shown to be voluntary and given without coercion, fear produced by threats or mistreatment, or promises . . ."

Regarding the contention that the confession was coerced, we observe that the instrument itself recites that the statement was voluntarily made and initiated by that defendant, and find that the evidence was clearly sufficient to support the ruling of the trial court. As stated in *Castleberry v. State,* Okl.Cr., 522 P.2d 257, 269 (1974), we have repeatedly held:

". . . This Court will not disturb the trial court's ruling permitting the introduction of a confession if supported by sufficient evidence that the defendant knowingly and intelligently waived his rights and understood the consequences of said waiver. *Warren v. State,* Okl. Cr., 495 P.2d 837."

In his third assignment of error, defendant Williams asserts as error the refusal of the trial court to admit into evidence the video tape statement he gave on November 3, 1973, wherein he exonerated himself from involvement in the subject offense and attributed the commission thereof to defendant Justus.

The general rule in this regard is set forth in 29 Am.Jur.2d, Evidence, § 535, page 586, as follows:

"When a confession is admissible, the whole of what the accused said upon the subject at the time of making the confession is admissible and should be taken together; and if the prosecution fails to prove the whole statement, the accused is entitled to put in evidence all that was said to and by him at the time which bears upon the subject of controversy, including any exculpatory or self-serving declarations connected therewith. . . . *To be admissible, however, it must clearly appear that the exculpatory statements were made in the same confession or conversation sought to be introduced in evidence, and not upon other or separate occasions. . . .*" (Footnotes omitted, emphasis added)

See, Annotation 2 ALR 1017, supplemented at 26 ALR 541. This principle has previously been recognized by this Court. See, *Foster v. State,* 8 Okl.Cr. 139, 126 P. 835 (1912); *Haddock v. State,* 64 Okl.Cr. 353, 81 P.2d 339 (1938), and *Henson v. State,* 97 Okl.Cr. 240, 261 P.2d 916 (1953). However, only to the extent that the self-serving declaration is sufficiently related in both time and subject matter to the confession, is there an adequate guarantee of testimonial trustworthiness to justify admission as an exception to the hearsay rule. This video tape and State's Exhibit No. 2A were here executed under different circumstances on distinct occasions separated by two complete days. We are, therefore, of the opinion that the trial court did not err in refusing admission under the above rule. See, *State v. Barnwell,* 17 N.C.App. 299, 194 S.E.2d 63 (1973), and *State v. Thompson,* 116 La. 829, 41 So. 107 (1906).

In this connection defendant Williams further argues that the video tape statement did not constitute hearsay because this exculpatory statement was not offered to prove the truth of the facts therein asserted but to establish that his subsequent confession was involuntary.

However, he cites no authority so holding in this context. The principle in this regard is set forth in 29 Am.Jur.2d, Evidence, § 497, page 555, as follows:

". . . The clearest case of hearsay is where a witness testifies to the declarations of another for the purpose of proving the facts asserted by the declarant. The hearsay rule, however, does not operate, even apart from its exceptions, to render inadmissible every statement repeated by a witness as made by another person. It does not exclude evidence offered to prove the fact that a statement was made or a conversation was had, rather than the truth of what was said. Where the mere fact that a statement was made or a conversation was had is independently relevant, regardless of its truth or falsity, such evidence is admissible as a verbal act. . . ." (Footnotes omitted)

The record clearly reveals that defense counsel was fully afforded the opportunity to cross-examine the State's witnesses as to the circumstances surrounding the confession and the extent to which that defendant was previously interrogated. We are of the opinion that, independent of the truth value of the facts therein asserted, the exculpatory statements contained in the video tape, in and of themselves, had no material probative value bearing on the voluntariness of his actions in confessing two days later. Such argument is totally contrary to the authority and rationale upon which the above stated rules are based.

The fourth assignment of error presented by defendant Williams assumes the video tape discussed immediately above to be admissible but for prejudice to defendant Justus, and asserts that a severance should have been granted since his co-defendant objected to the introduction thereof. Since defendant Williams therein exculpated himself and inculpated his co-defendant, the trial court refused to admit this video tape upon the additional grounds that to do so would be fatally violative of defendant Justus' right to confrontation under the purview of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The United States Supreme Court there held that upon joint trial the government's introduction of the confession of a co-defendant also implicating the defendant violated the latter's right of confrontation under the Sixth Amendment to the United States Constitution.

We have already held that the trial court was correct in excluding this video tape as a self-serving hearsay declaration not coming within an exception to that rule. However, assuming arguendo that this statement was otherwise admissible, we further agree with the trial court that the failure of defendant Williams to timely request a severance precluded the introduction thereof, since defendant Justus would thereby have been denied the right of cross-examination on a statement purely inculpatory as to him alone. The introduction of the tape would have been particularly flagrant here since defendant Williams indicated, in testifying at the evidentiary hearing discussed above, that he had not therein told the truth regarding any involvement of defendant Justus in the subject offense. The record reveals that defense counsel for defendant Williams learned of the existence of this video tape at the preliminary hearing. However, a Motion for Severance was never filed with the trial court, and this matter was not in any manner presented to the trial court until the above evidentiary hearing and after the jury was empanelled. The defendant cites *Clark v. State*, Okl.Cr., 509 P.2d 1398 (1973), in support of this proposition. However, we there held that a timely defense motion for severance should have been granted since the State sought to introduce a confession prejudicially violative of *Bruton*. In the present case, defendant Williams sought to introduce, in his own defense, a statement prejudicial to his co-defendant. Neither the State nor the court should be required to anticipate whether one defendant might seek to introduce evidence so prejudicial to a co-defendant that

a severance would be necessitated. We are of the clear opinion that in such cases the correct rule is stated in *Jones v. State*, Okl.Cr., 527 P.2d 169, 174 (1974), as follows:

". . . It is this Court's opinion that it must always be the rule that severance must be requested by defense counsel with counsel apprising the trial court of circumstances which may develop which might prejudice other co-defendants. Without such information a judge cannot be presumed to know or can it be considered to appear that prejudice will result from the joinder. . . ."

 In passing, we are constrained to observe that under the facts and circumstances here presented, the trial of this case as conducted did not constitute a fatally prejudicial violation of the *Bruton* rule. Although in his confession defendant Williams indicated that defendant Justus encouraged him to kill the victim, and defendant Justus, in his confession, asserted that there was not supposed to be any shooting, both confessions were otherwise perfectly compatible and not antagonistic to one another. Neither defendant ever objected to the introduction of the confession of the other or moved for a severance upon this basis. Each defendant subsequently took the witness stand and was subjected to cross-examination by his co-defendant, and the trial court instructed that each confession could be considered as competent evidence only as to the confessor and not as to the other defendant. See, *Davis v. State*, Okl.Cr., 524 P.2d 532 (1975); *Gregor v. State*, Okl.Cr., 505 P.2d 519 (1973); *Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), and *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

 The fifth assignment of error of defendant Williams asserts that the video tape statement of defendant Justus, State's Exhibit No. 1, should not have been admitted because the State did not estab-lish a sufficient chain of custody and therefore failed to adequately prove that the exhibit had not been altered. This argument is predicated upon the fact that Officer Coffia had maintained custodial possession by storing the tape in a closet at his home when not withdrawn for investigative or prosecutorial purposes. Assuming that under *Bruton* the defendant has standing to raise this issue, despite a limiting instruction that this was competent evidence as against the confessor only, we find this proposition to be wholly without merit. Authenticity was sufficiently established through Officer Coffia, who specifically identified the video tape and testified at the above evidentiary hearing that as presented this exhibit was a true and correct representation of the actual events depicted therein, and that the original tape had not been altered or tampered with in any manner. (Tr. 187–188, 195 and 201–202) See Annotation 60 ALR3rd 333. This specific argument was upon like facts rejected in *Paramore v. State*, Fla., 229 So.2d 855 (1969), vacated on other grounds, 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 751 (1972). Also, in upholding the admissibility of a video tape confession in *Hendricks v. Swenson*, 456 F.2d 503, 506 (8th Cir. 1972), that Court stated:

"If a proper foundation is laid for the admission of a video tape by showing that it truly and correctly depicted the events and persons shown, and that it accurately reproduced the defendant's confession, we feel that it is an advancement in the field of criminal procedure and a protection of defendant's rights. . . ."

Defendant Williams argues, in his sixth assignment of error, that reversible error resulted from the admission of the photograph of the victim, State's Exhibit No. 3, since any probative value was clearly outweighed by the prejudicial and inflammatory nature thereof. We do not agree.

 In *Pate v. State*, Okl.Cr., 361 P.2d 1086 (1961), we again recognized that the introduction of photographs taken sub-

sequent to a homicide is largely within the discretion of the trial court and not a cause for reversal absent an abuse thereof, and have repeatedly applied the principles set forth in the ninth paragraph of the Syllabus thereof, as follows:

> "Although it is error to receive in evidence gruesome photographs of a homicide victim, designed primarily to arouse the passion of the jury, such photographs are admissible; when they are relevant to the issues before the court and their probative value is not outweighed by the danger of prejudice to the defendant."

Also see, *Vavra v. State*, Okl.Cr., 509 P.2d 1379 (1973) and *Hopkins v. State*, Okl.Cr., 506 P.2d 580 (1973), together with case authority collected therein.

■ Despite the presence of blood, the black and white photograph involved in the present case was not ghastly nor gruesome, but did reflect the condition and location of the body upon being discovered shortly following the crime. This exhibit was corroborative of the confession of each defendant, and of the testimony of the investigating officers and the pathologist. Although the defendant asserts that the body had been moved when the picture was taken, this is mere conjecture not supported by the record. Other police officers arrived at the scene of the crime prior to Detective Knight, but that witness testified that the exhibit accurately portrayed the body as he first observed the victim. We agree with the State· that the smeared blood depicted therein may ·have been caused by the victim's own body movements or extraneous sources not necessitating the conclusion that the body had been moved. We, therefore, ·hold that the photograph was relevant to the issues before the jury, and that the probative value of the exhibit was not outweighed by the danger of prejudice to the defendant.

The seventh assignment of error of defendant Williams asserts that prejudicial and reversible error occurred in the direct examination by the State of Detective Knight regarding the details of the autopsy. The complained of examination ·was as follows:

> "Q. Now, Mr. Knight, you saw the.doctor, didn't you?
>
> "A. Yes, sir.
>
> "Q. Did you see him take her heart out?
>
> "A. Yes, sir, I did.
>
> "Q. Did you see him remove other ·organs of·her·body?
>
> "A. Yes, sir, I did.
>
> "Q. Cut ·her in many pieces, .didn't he?
>
> "A. Yes, sir.
>
> "Q. Was she dead?
>
> "A. Yes, sir." (Tr. 374–375)

■ This proposition is also without merit, however, for the reason that no objection was made to this testimony, and for the further reason that defense counsel for the defendant Williams, himself, equally inquired into this area, thereby waiving any error introduced by the State. Although needlessly and imperfectly done, the record reveals that the apparent purpose of the prosecutor in pursuing this line of interrogation was to establish that the victim was dead and thereby an element of the corpus delicti as a predicate for admissibility of the confessions. No objection, request for admonishment, or Motion for Mistrial, was ·interposed at the time of this examination, rather, immediately following that examination defense counsel for defendant Williams cross-examined this ·witness as follows:

> "Q. Now then. You stated to Mr. Harris that the doctor took her heart out?
>
> "A. Yes, sir.
>
> "Q. Did he find a bullet.in.it?
>
> "A. No, ·sir.
>
> ¡"Q. Did · he tell you that was the heart?
>
> "A. Sir, I have seen numerous autopsies.
>
> * * * * * *

"Q. Then did you cut what you saw him take out?

"A. Did I personally do this?

"Q. Put it in your hand and examine it?

"A. No, sir." (Tr. 375–376)

Not until further trial proceedings the next day did defendant Williams move for a mistrial claiming prejudice upon this basis. The general rule in this regard is set forth in paragraph three of the Syllabus of *Love v. State*, Okl.Cr., 360 P.2d 954 (1960), as follows:

"It is the duty of counsel to raise at the proper time all objections to the proceedings . . . and when this is not done, they will be treated as waived unless they are of such a nature as to deny defendant a fair and impartial trial."

In this appeal the defendants additionally have the very able assistance of briefs filed Amicus Curiae in opposition to capital punishment by attorneys for both the American Civil Liberties Union of Oklahoma and the NAACP Legal Defense and Educational Fund, Inc., with leave of this Court. Considering all the briefs together, we are urged to hold the death sentences herein unconstitutional for any one of the following reasons:

1. The death penalty is cruel and unusual punishment per se;

2. The scheme for enforcement of capital punishment within this State is so permeated with unbridled discretion that imposition of the death penalty would constitute invidious discrimination and therefore cruel and unusual punishment;

3. The statutory classification of capital offenses in this State is so discriminatory, arbitrary, and vague that their enforcement would deny equal protection and due process of law.

In the consolidated cases of *Furman v. Georgia, Jackson v. Georgia*, and *Branch v. Texas*, 408 U.S. 238, 92 S.Ct. 2726, 33 L. Ed.2d 346 (1972), hereinafter cited by reference to the lead case, the United States Supreme Court rendered a per curiam opinion stating that:

". . . The Court holds that the imposition and carrying out of the death penalty in these cases constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." (408 U.S. 239, 92 S.Ct. 2727)

A majority of that court could not agree upon a more specific statement of law for future application. Each of the nine members of the court wrote separate opinions, with five justices joining in the per curiam decision, and four dissenting therefrom. Only two members of the majority concluded that the death penalty was cruel and unusual punishment per se, while the remaining three were of the opinion that death sentences imposed under statutes permitting the imposition of that penalty or a lesser punishment at the unbridled discretion of the judge or jury resulted in invidious discrimination and therefore constituted cruel and unusual punishment. That decision was recognized and followed within this jurisdiction, and resulted in numerous death sentences so imposed being modified to life imprisonment. See, *Pate v. State*, Okl.Cr., 507 P.2d 915 (1973).

Clearly, *Furman* does not stand for the proposition that the death penalty is cruel and unusual punishment per se. Contrary to the contention that capital punishment is incompatible with contemporary standards of decency, we observe that thirty-two states and the federal government have enacted capital punishment statutes responsive to *Furman*, and by a two-to-one margin the voters in California adopted a State constitutional amendment providing for capital punishment following State court action which held the death penalty to be violative of the State constitution. See: 17 Criminal Law Reporter 4030, containing a summary of the April 23, 1975, oral argument before the United States Supreme Court on the issue of the constitutionality of capital punishment in the pending case of *State v. Fowler*, 285 N.C. 90, 203 S.E.2d 803 (1974), pet. for

cert. to S.Ct. of N.C. granted, 419 U.S. 963, 95 S.Ct. 223, 42 L.Ed.2d 177 (No. 73–7031, Oct. 29, 1974) ; and, Act 29, House Bill number 150, Vernon's Missouri Legislative Service, page 79 (1975), approved subsequent thereto on June 23, 1975. This Court has previously held that the death penalty is not cruel and unusual punishment per se, and now re-affirms the following language from *Fesmire v. State*, Okl.Cr., 456 P.2d 573, 587 (1969), death sentence modified pursuant to *Furman*, 408 U.S. 935, 92 S.Ct. 2855, 33 L.Ed.2d 749 (1972), 502 P.2d 1048 (1972) :

" . . . Although the comparative merits of capital punishment have been presented in arguments before this Court many times, and the proponents for its abolition have argued its moral, legal, and social implications, neither this Court, nor as yet the Supreme Court of the United States, has seen fit to classify the imposition of capital punishment as being cruel and unusual and therefore in violation of the Constitution of the United States."

Effective May 17, 1973, the Oklahoma Legislature repealed capital punishment provisions for Murder such as those under which death sentences were held to be unconstitutional in *Furman*, and enacted 21 O.S.Supp.1974, § 701.1 et seq., in an effort to comply with the mandate of that case. The defendants were here convicted under the provisions of § 701.1, which insofar as pertinent provides:

"Homicide, when perpetrated without authority of law and with a premeditated design to effect the death of the person killed, or of any other human being, is murder in the first degree in the following cases:

\* \* \* \* \* \*

"2. When perpetrated by one committing or attempting to commit rape, kidnapping for the purpose of extortion, arson in the first degree, armed robbery or when death occurs following the sexual molestation of a child under the age of sixteen (16) years;"

Each defendant was thereafter sentenced in accordance with § 701.3, providing in part:

"Every person convicted of murder in the first degree shall suffer death. In the case of a jury trial, the jury shall determine only whether the defendant is guilty or not guilty of murder in the first degree and upon a finding of guilty shall so indicate on their verdict and state affirmatively in their verdict that the defendant shall suffer death. In a case where a jury trial is waived, and the case is tried to the court, or upon a plea of guilty to the court, upon a finding by the court that the defendant is guilty of murder in the first degree, the court shall enter a judgment and sentence of death. . . . "

Although many of the other states responding to *Furman* with new capital punishment enactments have not deemed the total abolition of sentencing discretion to be necessary, the above statutory provisions clearly eliminate sentencing discretion for the crime of First Degree Murder within this State and are representative of the extreme approach necessary to curb the unfettered sentencing discretion condemned in that case. See Comment, Discretion and the Constitutionality of the New Death Penalty Statutes, 87 Harv.L.Rev. 1690 (1974). We are, however, urged that prohibitive discretion remains within the scheme for enforcement of capital punishment in this State. Specifically, the argument is made that unbridled discretion persists in the following respects: The prosecutor may decide what charge, if any, to file and pursue and negotiate in behalf of the State for a plea of guilty to a reduced offense; the judge or jury trying the case may find the defendant guilty of a lesser included offense; this Court may modify the death sentence to life imprisonment; and, the Governor may exercise executive clemency in granting commutations and pardons. The contention is also made that the jury may find the accused guilty of First Degree Murder but refuse to affirm-

atively state in their verdict that the defendant shall suffer death as called for in 21 O.S.Supp.1974, § 701.3, supra. However, as to this latter contention we need only observe that the introductory sentence to that section makes the death penalty mandatory upon conviction, and direct attention to 22 O.S.1971, § 927, which provides:

"Where the jury find a verdict of guilty, and fail to agree on the punishment to be inflicted, or do not declare such punishment by their verdict, the court shall assess and declare the punishment and render the judgment accordingly."

The briefs filed amicus curiae cite *Commonwealth v. A Juvenile,* Mass., 300 N.E. 2d 439 (1973), in support of the proposition that *Furman* extends to any discretionary imposition of the death penalty at all levels. In that case the court held that *Furman* prohibited imposition of the death penalty upon a juvenile under statutory provisions whereby even upon conviction as an adult the trial judge could within his discretion either sentence the accused to death, or eliminate the possibility of capital punishment by adjudicating him to be a delinquent child despite prior judicial determination that he should be prosecuted as an adult. Like *Furman,* this case deals with sentencing discretion by the judge or jury upon conviction, and does not stand for the proposition that a juvenile cannot be certified for prosecution as an adult on otherwise valid capital punishment provisions. As so construed, that case is perfectly in align with *Furman.*

Since the decision in *Furman,* this argument has, in whole or part, been presented to the highest court of at least six states, and to the extent offered has been consistently rejected. Thus; in *State v. Jarrette,* 284 N.C. 625, 202 S.E.2d 721, 741 and 743 (1974), that court reasoned in part as follows:

"The arguments of the defendant and of the amicus curiae . . . may be summarized as follows: . . . Al-

though . . . the imposition of the death sentence [is] mandatory upon conviction of first degree murder or rape, the death penalty is nevertheless discretionary and selective because (a) the Solicitor has the power to prosecute for a lesser charge, (b) the jury has the power to acquit or to convict of a lesser charge, and (c) the Governor has the power to commute the sentence or grant a pardon;

. . .

\* \* \* \* \* \*

"The Equal Protection Clause of the Fourteenth Amendment makes no distinction between sentences to death and sentences to imprisonment. The Due Process Clause of that amendment protects liberty as well as life. The discretion in the Solicitor, in the jury and in the Governor, of which the amicus curiae complains, extends also to non-capital cases. If the existence of these discretionary powers makes the imposition of the death penalty unconstitutional, it would also make unconstitutional all prison terms, however long or short. Quite obviously, this is not the kind of discretion which the Supreme Court of the United States held impermissible in *Furman v. Georgia* . . . ."

Also, In *Jefferson v. Commonwealth,* 214 Va. 747, 204 S.E.2d 258, 260–261 (1974), that court refused to extend *Furman* beyond discretionary sentencing and held:

"While conceding that death is the only penalty which may be imposed upon conviction of killing a prison guard . . . the defendant argues that 'the statute's operation inevitably requires the exercise of a broad range of uncontrolled selective discretion' by Commonwealth's attorneys and trial judges and that the Governor of Virginia could extend executive clemency. . . .

"The substance of this argument is that a statute imposing the death penalty is constitutionally infirm under *Furman* where any discretion may be exercised by any authority at any time, either before, during or after trial.

"We do not so construe *Furman*. The constitutional infirmity there was found in fixing punishment, be it by a jury or a judge. *Furman's* application is thus limited to statutes which permit such discretion to be exercised."

With particular regard to prosecutorial discretion, the court in *Jarrette,* supra, stated in part as follows:

" . . . The decision of the Solicitor as to the offense for which he will seek an indictment from the grand jury and his decision as to whether to accept, with the permission of the court, a plea to a lesser charge, included within the offense specified in the indictment returned, are the results of an evaluation of the available evidence, including its credibility. The Solicitor's decision to charge a defendant with a crime, punishable by death if he is convicted, is a solemn one, properly reached only when, in the Solicitor's judgment, the evidence of guilt is clear and convincing. This is a human evaluation. There is often room for difference of opinion concerning it. To say, as does the brief of the amicus curiae, that because the Solicitor determines in many cases that he should seek a conviction of a lesser offense, his decisions to seek convictions on capital charges in other cases are 'freakish' is a patent absurdity . . .

"The purpose of vesting the power of judgment in an official is to enable him to make different decisions in different cases in light of what he determines to be materially different factual situations. All governmental actions are based on this delegation of responsibility. The Fourteenth Amendment to the Constitution of the United States does not require a state, in the enforcement of its criminal laws, so to hedge its prosecuting attorney about with 'guidelines' that he becomes a mere automaton, acting on the impulse of a computer and treating all persons accused of criminal conduct exactly alike. From the foundation of the country to the present date, the discre-

tion, now complained of by the amicus curiae, has been vested in prosecuting officers throughout the country. Without it, the greatest injustices would necessarily be inflicted upon innocent persons accused of crime." (202 S.E.2d 741–742)

Additionally, this Court has recently recognized the legislative curtailment of circumstances in which the trial court can, pursuant to plea bargaining, accept a plea of guilty to a lesser included offense reduced from First Degree Murder in *State ex rel. Young v. Warren,* Okl.Cr., 536 P.2d 965, 971–972 (1975), wherein we stated in part:

"Since the trial court is required, before giving . . . an instruction on a lesser offense, at a trial for Murder in the First Degree, to cause the record to reflect the evidence upon which he bases his instruction for the lesser offense, [See 21 O.S.Supp.1974, § 701.3, infra] it necessarily follows that he may not constitutionally allow plea bargaining between the State and the defendant, or defendants, unless the following conditions are met:

"In all capital cases where a preliminary examination has been conducted on the charge of Murder in the First Degree, as in the instant case, and the testimony taken at said preliminary examination is sufficient to hold the defendant, or defendants, for trial, and the defendant, or defendants, thereafter enters a plea of not guilty at arraignment, the trial court, before permitting a reduction of the charge from Murder in the First Degree to any lesser offense, MUST require the State, by competent evidence to establish that sufficient evidence exists to establish that the defendant, or defendants, was guilty of the lesser included offense, and not Murder in the First Degree. We reiterate that to do otherwise would violate the clear intent of 21 O.S. Supp.1974, § 701.3, and render unconstitutional the provisions of 21 O.S.Supp.

1974, § 701.1, under the decisions of the United States Supreme Court in *Furman* . . .

" . . . Nothing in this opinion shall be construed as precluding the State from granting the defendants in any case, capital or otherwise, immunity from prosecution, so long as the immunity granted conforms to the Constitution and statutes of the State of Oklahoma and the Constitution and statutes of the United States.

"We emphasize that the procedure detailed above, is applicable only to cases wherein the defendant, or defendants, was originally charged with Murder in the First Degree in violation of 21 O.S.Supp.1974, § 701.1.

"Nothing in this opinion should be construed as prohibiting the trial court from instructing in the manner provided by 21 O.S.Supp.1974, § 701.3, if the evidence on trial warrants an instruction on a lesser offense."

With regard to instructions on lesser included offenses, 21 O.S.Supp.1974, § 701.3, provides:

" . . . In a jury trial for murder in the first degree, nothing in this section shall preclude the trial judge from instructing the jury regarding lesser and included offenses and lesser degrees of homicide if the evidence warrants such instructions; but in every instance where an instruction authorizes the jury to consider lesser and included offenses and lesser degrees of homicide, the judge shall state into the record his reasons for giving the instruction based upon the evidence adduced at trial."

The State of Delaware is the only jurisdiction noted to seemingly adopt the view now urged upon us that prohibitive discretion remains where the judge or jury trying the case may find the accused guilty of a lesser included offense. In *State v. Sheppard,* Del.Supr., 331 A.2d 142 (1975) that court held constitutional a recently enacted statute making capital punishment mandatory for first degree murder, assuming uniform application, and further restated in part the following dictum from *State v. Dickerson,* Del.Supr., 298 A.2d 761, 769–770 (1972), as follows:

" '* * * the result reached here does not necessarily solve the problems created by the *Furman* decision for any state wishing to retain capital punishment. History shows that the mandatory death sentence for first degree murder is also open to caprice and discrimination in the imposition of the death penalty. The jury's route for the exercise of such caprice and discrimination, historically, is to return a verdict for a lesser-included offense carrying a lesser penalty.

. . .

" 'Obviously, any lack of uniform application—any discrimination or caprice in the imposition of the death sentence via the lesser-included offense route—will expose the mandatory death penalty provision of the Murder Statute, hereby upheld, to the same condemnation as was accorded the Mercy Statute in the *Furman* case.' " (331 A.2d 144–145)

However, in both *State v. Hill,* La., 297 So.2d 660 (1974) and *State v. Selman,* La., 300 So.2d 467 (1974), that court rejected the contention that lesser included or responsive verdicts provided for by statute permitted the jury to exercise uncontrolled discretion prohibited by *Furman.* In *State v. Dixon,* Fla., 283 So.2d 1 (1973), that court upheld a capital punishment enactment responsive to *Furman,* which unlike our statute requires a judge and jury to weigh aggravating and mitigating circumstances before assessing the death penalty. That court reasoned, in part, as follows:

" . . . The mere presence of discretion in the sentencing procedure cannot render the procedure violative of *Furman v. Georgia,* . . . ; it was, rather, the quality of discretion and the manner in which it was applied that dictated

the rule of law which constitutes *Furman v. Georgia,* . . .

"Discretion and judgment are essential to the judicial process, and are present at all stages of its progression—arrest, arraignment, trial, verdict, and onward through final appeal. Even after the final appeal is laid to rest, complete discretion remains in the executive branch of government to honor or reject a plea for clemency. . . .

"Thus, if the judicial discretion . . . can be shown to be reasonable and controlled, rather than capricious and discriminatory, the test of *Furman v. Georgia,* . . . has been met. What new test the Supreme Court of the United States might develop at a later date, it is not for this Court to suggest." (283 So. 2d 6-7)

Also, in *Coley v. State,* 231 Ga. 829, 204 S.E.2d 612 (1974), that court upheld a new capital punishment enactment which required the judge or jury to first find the presence of one of several prescribed aggravating circumstances before the death penalty could be assessed. In so holding, the court reasoned in part as follows:

" . . . The U.S. Supreme Court's multiple-opinion decision in *Furman* and *Jackson* seems to leave the door ajar, . . . at least to some extent, for new legislation by the States permitting the exercise of some controlled discretion through the use of objective standards by which the sentencing authority may be guided in imposing the penalty of death. The States are free, we must conclude, to provide a new system short of mandatory application, . . .

" . . . The essential question is not whether our new death statute permits the use of some discretion, because admittedly it does, but, rather, whether the discretion to be exercised is controlled by clear and objective standards so as to produce non-discriminatory application. After all, some discretion is inherent in any system of justice, from arrest to final

review. In the same context, for example, the U.S. Supreme Court's 'decision to grant or deny certiorari is by law discretionary and the decision to hear argument on appeal has of necessity also come to depend on an element of discretion.' Goldberg and Dershowitz, Declaring the Death Penalty Unconstitutional, 83 Harv.L.Rev. 1773, 1803. Logically, it is not discretion per se which must be condemned, but it is unguided discretion that does not 'produce evenhanded justice.' " (204 S.E.2d 615–616)

Finally, in *Jurek v. State,* 522 S.W.2d 934 (Tex.Cr.App., 1975), that court most recently upheld a new capital punishment scheme which requires that the jury unanimously find against the defendant with reference to all three statutorily prescribed aggravating categories before the trial court shall then sentence the accused to death. In so holding, the court reasoned in part as follows:

"Some discretion is inherent and desirable in any system of justice, from arrest to final judgment. \* \* \* The mere presence of discretion in the sentencing process does not render that procedure violative of *Furman.* It is rather the quality of discretion and the manner in which it is applied that must be controlled. To eliminate all discretion on the part of the jury would be to risk elimination of that valuable element which permits individualization based on consideration of all extenuating circumstances and would eliminate the element of mercy, one of the fundamental traditions of our system of criminal jurisprudence. If discretion in the assessment of punishment under a statute can be shown to be reasonable and controlled, rather than capricious and discriminatory, the test of *Furman* will be met." (at page 940, footnote omitted)

■■■ This Court indicated that 21 O.S.Supp.1974, § 701.3, should be strictly construed to permit lesser included instructions only where clearly appropriate in

*Murray v. State,* Okl.Cr., 528 P.2d 739 (1974), wherein we held that an instruction upon Second Degree Murder was improper in a First Degree Murder prosecution allegedly perpetrated pursuant to an armed robbery. In accordance therewith, an instruction upon a lesser included offense was not appropriate or given in the present case. However, we are of the opinion that as so construed the approach introduced through this statute is the only satisfactory and lawful manner in which both the interest of the defendant in a fair and impartial trial by jury and the right of the State to fully prosecute may be maintained. To the extent that instructions upon appropriate lesser included offenses are not submitted, the jury would not have the opportunity to consider whether the defendant might only be guilty of a less serious crime, and he would thereby effectively be deprived of his right to a full and complete trial by jury. Also, since jeopardy would attach to further prosecution upon any offense necessarily included within that charged, in the selection or election of charges, the prosecutor would be required to speculate upon what evidence the jury might ultimately believe.

As to appellate review, 21 O.S.Supp.1974, §§ 701.5 and 701.6, respectively, provide:

"The Court of Criminal Appeals when reviewing a judgment and sentence of death shall, in the first instance, determine whether errors of law occurring at trial require reversal or modification, but if the Court shall determine that there are not errors of law in the record requiring reversal or modification, the Court shall then convene for the purpose of reviewing the sentence of death. The Court shall set a date certain for an evidentiary hearing, the purpose of which will be to determine if the sentence of death comports with the principles of due process and equal protection of the law. Upon the hearing the Court shall determine whether the sentence of death was a result of discrimination based on race, creed, economic condition, social position, class or sex of the defendant or any other arbitrary fact; and the Court shall specifically determine whether the sentence of death is substantially disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

"Should the Court determine that the sentence of death is discriminatory or is substantially disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant, the Court shall modify the sentence of death to life in the penitentiary at hard labor."

In our Interim Opinion herein, we rejected the contention that 21 O.S.Supp. 1974, §§ 701.5 and 701.6, introduce or perpetuate another discretionary level in an already discretionary riddled system. Pursuant thereto the evidentiary hearing contemplated therein was assigned and heard for the purpose of determining whether the sentence of death was the result of discrimination or substantially disproportionate to the penalty imposed in similar cases, and thereby violative of principles of due process and equal protection of the law. No evidence was offered by either the defendants or the State upon that hearing. Rather, shortly prior thereto each defendant filed a motion requesting that this Court establish guidelines for the review of death sentences under those statutory provisions, and each party hereto candidly indicated that without such guidelines these statutes were so vague and uncertain that they were unaware as to how to proceed.

We are now of the opinion that 21 O.S.Supp.1974, §§ 701.5 and 701.6, are unconstitutional. The provisions regarding the hearing contemplated therein are so vague, indefinite and uncertain that they are incapable of rational interpretation and implementation without additional legislation. Also, such a hearing is duplicitous to that procedure previously established for the presentation of evidence before the trial court upon any legal issue, including such issues as adherence to prin-

ciples of due process and equal protection of the law, with this Court then fulfilling the role of appellate review rather than a court of first impression. We do not by our decision herein, however, in any manner preclude or limit the right of a defendant before this Court on appeal to present a Motion for New Trial based upon newly discovered evidence as otherwise provided for in 22 O.S.1971, § 953. See also, Rule 2.12, 22 O.S.Supp.1974, Ch. 18, App. Nothing in this opinion shall preclude the defendants from asserting violation of constitutionally guaranteed rights not dealt within this opinion in a post conviction proceeding under the provisions of 22 O.S.1971, § 1080 et seq. Further, under the mandatory scheme of capital punishment adopted by the Legislature, we are of the opinion that the proper remedy, where otherwise appropriate, for deprivation of any accused's right to due process and equal protection of the law is reversal for a new trial rather modification to life imprisonment. The exercise of such modification powers by this Court for an offense which the Legislature has otherwise mandated capital punishment would be violative of *Furman.* The power of this Court to modify a sentence imposed by the jury or the trial court must be within the limits of the statutory provisions governing the particular crime charged. See, *Brown v. State,* Okl.Cr., 314 P.2d 362 (1957). Since the Legislature has now provided but one sentence for the offense of First Degree Murder, the appropriate inquiry is whether a conviction for First Degree Murder is consistent with the law and not whether a sentence of death is substantially disproportionate to the penalty imposed in similar cases. Those cases under the mercy statutes which preceded 21 O.S. Supp.1974, § 701.1 et seq., are now irrelevant insofar as the assessment of punishment is concerned. Of course, any discriminatory application of the current capital punishment provisions could be presented as a violation of a defendant's right to equal protection of the law. The unconsti-

tutionality, however, of 21 O.S.Supp.1974, §§ 701.5 and 701.6, do not render the remaining provisions of that Act unconstitutional since those provisions were enacted with a severability clause attached. see, House Bill No. 1101, Oklahoma Session Laws 1973, Chapter 167, pages 240–242.

■ Article VI, § 10, of the Oklahoma Constitution grants the Governor authority to commute or pardon those convicted of capital offenses upon a favorable recommendation by a majority of the Pardon and Parole Board. We cannot agree that such a system of executive review must, as such, introduce invidious discrimination. In this regard we join the court in *Jarrette,* supra, in reasoning that:

"It is quite true that . . . the Constitution of North Carolina gives to the Governor of this State the authority to commute a death sentence imposed upon any defendant, or to grant to such defendant an absolute pardon, and to refuse to disturb such sentence imposed upon a different defendant. . . . [T]he Constitution of the United States confers a like power upon the President. So far as we have been able to determine, a like power is vested in the Governor, or some other official of the Executive Department, in each of our states. This power has existed and has been exercised repeatedly by the Governors of every state and by the President of the United States from the birth of our country. If its existence and frequent exercise makes the imposition of the death penalty unconstitutional per se, the nine Justices of the Supreme Court of the United States wasted a great deal of thought and much paper in *Furman v. Georgia,* . . . None of them so suggested in that case.

". . . The Governor exercises his judgment after investigation of the record of the trial and other circumstances, including subsequently discovered evidence. This Court reviews the rulings of the trial judge. The Governor re-

views the decision of the jury, which we may not do. The exercise by one Governor of this judgment, resulting in the commutation of the sentence of one man convicted of murder or rape and the refusal to commute the sentence of another convicted of such crime, cannot be called 'freakish' or 'arbitrary' merely because another Governor might, theoretically, have reached opposite conclusions." (202 S.E.2d 742–743)

We are further fortified in this regard by the language employed by the United States Supreme Court in the post-*Furman* case of *Schick v. Reed,* 419 U.S. 256, 95 S.Ct. 379, 42 L.Ed.2d 430 (1974), as follows:

". . . [T]his Court has long read the Constitution as authorizing the President to deal with individual cases by granting conditional pardons. The very essence of the pardoning power is to treat each case individually.

\* \* \* \* \* \*

". . . Individual acts of clemency inherently call for discriminating choices because no two cases are the same. . ."

As there recognized by the United States Supreme Court, this was the state of the law at the time of their previous decision in *Furman,* yet there was no indication in *Furman* that the power of executive clemency had resulted in the invidious discrimination therein criticized.

■ We therefore hold that the scheme for enforcement of capital punishment within this State under the provisions of 21 O.S.Supp.1974, § 701.1 et seq., as construed, does not constitute cruel and unusual punishment and is not violative of the Eighth and Fourteenth Amendments to the United States Constitution as interpreted by the United States Supreme Court in *Furman.*

We consider next the argument that the statutory classification of capital offenses under which the defendants were convicted is so arbitrary, discriminatory, and vague that enforcement of the death penalty

would deny equal protection and due process of the law in violation of the Fourteenth Amendment to the United States Constitution. Among other cases cited in support thereof is *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), wherein the United States Supreme Court held that a statutory scheme providing for the sterilization of habitual criminals was violative of the Equal Protection Clause, as the Act provided for the sterilization of those convicted of such offenses as larceny by theft or fraud, but exempted those convicted of such offenses as embezzlement, crimes which may be distinguished upon only so subtle a basis as when the felonious intent arose. In so holding, the court there reasoned in part as follows:

". . . When the law lays an unequal hand on those who have committed intrinsically the same quality of offense . . . it has made as invidious a discrimination as if it had selected a particular race or nationality for oppressive treatment. . . ." (316 U.S. 541, 62 S.Ct. 1113)

However, we further observe that the court there recognized that:

". . . Under our constitutional system the States in determining the reach and scope of particular legislation need not provide 'abstract symmetry.' . . . They may mark and set apart the classes and types of problems according to the needs and as dictated or suggested by experience . . . We must remember that the machinery of government would not work if it were not allowed a little play in its joints.' Only recently we reaffirmed the view that the equal protection clause does not prevent the legislature from recognizing 'degrees of evil' . . . 'the Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same.' . . . Thus, if we had here only a question as to a State's classification of crimes, such as embezzlement or larceny, no substan-

tial federal question would be raised. . . . For a State is not constrained in the exercise of its police power to ignore experience which marks a class of offenders or a family of offenses for special treatment. Nor is it prevented by the equal protection clause from confining 'its restrictions to those classes of cases where the need is deemed to be clearest.' . . . '[T]he law does all that is needed when it does all that it can, indicates a policy, applies it to all within the lines, and seeks to bring within the lines all similarly situated so far and so fast as its means allow.' " (316 U.S. 539–540, 62 S.Ct. 1112, citations omitted)

■ Of the various classifications of capital offenses set forth in 21 O.S.Supp. 1974, § 701.1, the defendants were convicted under one of the "felony-murder" categories deemed by the Legislature to be of such a nature that they should be classified as First Degree rather than Second Degree Murder under 21 O.S.Supp.1974, § 701.2. Although we are urged that each of the ten paragraphs enumerated within the aforementioned statute are upon this basis unconstitutional, as previously observed these provisions were enacted with a severability clause attached, see House Bill No. 1101, supra, and we are therefore of the opinion that the defendants have standing to raise this issue only to the extent that the unlawful and premeditated perpetration of homicide while committing or attempting to commit armed robbery may constitute such a classification.

■ We are of the opinion that this aspect of the statute cannot seriously be argued to be indefinite or vague, and contrary to the contention that such a classification is arbitrary and discriminatory we find the same to constitute a legitimate and reasonable exercise of police power by the Legislature. See, *Jefferson*, supra, where the court rejected the contention that a statute mandating capital punishment upon conviction of a prison inmate for killing a guard was unconstitutional because of the classification of persons to whom applicable. Also, in *Finley v. California*, 222 U.S. 28, 32 S.Ct. 13, 56 L.Ed. 75 (1911), the United States Supreme Court upheld a state statute mandating the death penalty for those serving a life sentence in a state prison who committed a malicious and felonious assault upon another, and rejected the contention that such an enactment denied the accused the equal protection between him and those convicts serving lesser terms. Prior to *Furman*, simple armed robbery, as well as the attempt to commit the same, was punishable by death or imprisonment at the discretion of the jury under 21 O.S.1971, § 801, irrespective of whether homicide resulted in the commission thereof. This was also true of kidnapping for the purpose of extortion and first degree rape under 21 O.S.1971, §§ 745 and 1115 respectively. These are felonies which have traditionally been recognized as being of such a nature that the ultimate penalty of death should be authorized. Clearly, the Legislative purpose in classifying certain "felony-murders" as first degree rather than second degree murder was to deter, with the death penalty, those crimes of a particularly heinous and brutal nature as well as those felonies necessarily involving great risk of death or serious bodily injury to the victim. Of course, to mandate the death penalty for the underlying felony, irrespective of whether homicide resulted, might well operate to encourage the murder of the victim, since the perpetrator of such felonies could now incur no greater penalty and may thereby better conceal his crime. This Court previously upheld the imposition of the death penalty for simple armed robbery under the above statute in *Ellis v. State*, 54 Okl. Cr. 295, 19 P.2d 972 (1933); and in *Robards v. State*, 37 Okl.Cr. 371, 259 P. 166, 167 (1927), we previously recognized that offense to be of an intrinsically distinguishable quality in rejecting the contention that the punishment then provided

therefor constituted cruel and unusual punishment as follows:

". . . [R]obbery by firearms, where resistance of the person sought to be robbed may be expected to result in death or serious bodily injury at the hands of the one engaged in such crime, is of so serious a nature and consequence that we cannot say, as a matter of law, that the punishment fixed by the statute makes it cruel or unusual, within the meaning of the Constitution. . . ."

Pursuant to Rule 2.12, subd. B, 22 O.S. Supp.1974, Ch. 18, App., and subsequent to perfecting this appeal defendant Justus filed with this Court a Motion for New Trial based upon newly discovered evidence. That Motion was predicated upon an affidavit purportedly executed by his co-defendant, Bobby Joe Williams, wherein the latter admits guilt of the subject offense but further states that he perpetrated the crime alone. Assuming that his co-defendant would so testify upon a retrial, we are of the opinion that such testimony is cumulative and there is no reasonable probability that a different result would follow upon a new trial.

At their joint trial, the State introduced the confession of each of the above defendants, and both confessions were in all essential respects mutually compatible and not antagonistic with regard to the involvement of the other defendant. Both the defendants took the witness stand in their own defense, and testified that the confessions were made under duress and were not their own statements. Defendant Justus introduced the defense of alibi, and was supported therein by the testimony of his wife. Defendant Williams denied any participation in the crime and any knowledge thereof and, in cross-examination by defense counsel for defendant Justus, further testified that he had previously implicated his co-defendant under duress and that he had no knowledge that defendant Justus had been involved in the offense. The only new matter thus presented by this Motion was that defendant Williams assumed sole responsibility for the crime, contrary to his sworn testimony at in camera proceedings before the trial court and in the trial itself, as well as his unsworn confession and a prior statement wherein he inculpated defendant Justus alone.

■■■ As set forth in paragraph two of the Syllabus to *Williams v. State*, 92 Okl.Cr. 70, 220 P.2d 836 (1950), this Court has repeatedly held:

"A new trial should not be granted upon the ground of newly discovered evidence where the same is merely cumulative. It must appear that, if the newly discovered evidence had been introduced in the trial, there is a reasonable probability that a different result would have been reached."

In *Wells v. State*, 16 Okl.Cr. 461, 184 P. 465 (1919) and *Whitworth v. State*, 80 Okl.Cr. 239, 158 P.2d 364, reversed on other grounds on rehearing 80 Okl.Cr. 239, 159 P.2d 277 (1945), this Court was previously presented with this question under similar circumstances. In *Wells* we stated that:

"The defendant filed a motion for a new trial upon the ground, among other grounds, of newly discovered evidence; the newly discovered evidence being contained in an affidavit made by said A. J. Seimen while in jail after his conviction, in which he fully refuted the evidence given by him on the trial of this case, and asserted that he alone, without the knowledge or assistance of the defendant, committed the larceny charged while at the dance, and completely exonerated the defendant from any complicity therein in any manner, and that he (affiant) had not communicated the facts stated in said affidavit to the defendant, or to any one, until after the trial in this case had been had. The court announced that it did not believe the averments of the said affidavit, overruled the motion for a new trial, and the defendant excepted.

\* \* \* \* \* \*

"Seiman on the trial of the case having testified that he had no knowledge of, or connection with the commission of the larceny charged, certainly no evidential weight could be given to the said newly discovered evidence, the averments of his affidavit 'that he alone committed the crime charged, and did so without the knowledge or assistance of the defendant,' and the court did not err in overruling the motion for a new trial." (184 P. 466–467)

Further, in the Syllabus and decision in *Whitworth*, we stated that:

"A motion for new trial was made upon grounds of newly discovered evidence, and supported by affidavit of defendant's brother (who was a co-defendant and had been convicted and was serving a sentence in the State penitentiary), that affiant and another committed the crime and that defendant was not present and had no knowledge thereof, affiant having previously testified at the trial of defendant that he had no part in the commission of the crime; *Held*: that such showing does not entitle the defendant to a new trial as a matter of right, but calls into exercise the sound discretion of the court, and such motion should be overruled unless the trial court believes that such recantation is probably true, and that another trial might result in the acquittal of the defendant.

"The practice of granting new trials upon affidavits of persons who have been convicted and then change their testimony, admitting that they had committed perjury, is not looked upon with favor by the courts.

\* \* \* \* \* \*

". . . It would be setting a dangerous precedent to permit a defendant to go upon the witness stand and commit perjury by testifying to his innocence, and that of his codefendant, and then when convicted make an affidavit admitting his perjury, . . ." (158 P.2d 364 and 368)

The confession of defendant Williams, wherein he also inculpated defendant Justus, was not competent evidence as to the latter, and the jury was so instructed. However, even assuming otherwise, defendant Justus would nevertheless not be entitled to a new trial as a matter of law since there was other evidence clearly sufficient to support the verdict. In *Ryal v. State*, 16 Okl.Cr. 266, 182 P. 253 (1919), we held that:

". . . An affidavit of a material witness for the state that he perjured himself on the trial of the defendant, . . . [does] not as a matter of right entitle a defendant to a new trial; but the granting of same is a matter of discretion of the trial court, and the court, under such state of the record, should not grant a new trial unless the court, in the exercise of its sound discretion, determines that the recantation of the witness was probably true. . . ."

Also see, *Tobler v. State*, 87 Okl.Cr. 25, 194 P.2d 202 (1948).

■ In view of the verdict of the jury and the evidence presented, we are persuaded that defendant Williams' version of the matter has run a full gamut. He first gave a statement implicating defendant Justus alone, he next gave a confession mutually compatible with that of defendant Justus, he then testified at the trial denying any knowledge of the subject offense, and finally, he now asserts that he was solely responsible for the crime. We are of the opinion that the present affidavit of defendant Williams is essentially cumulative to the exculpatory testimony he previously extended to defendant Justus and the alibi proof offered by the latter, and that testimony of defendant Williams consistent with his present affidavit would be so far impeachable with his prior inconsistent statements that in view of the evidence previously presented there is no reasonable probability that a different result would follow upon retrial. Accordingly, on Au-

gust 1, 1975, this Court by unanimous decision issued an order overruling the aforesaid Motion for New Trial.

Pursuant to Rule 1.11 of this Court, 22 O.S.Supp.1974, Ch. 18, App., this case was previously assigned and heard for oral argument. We have now carefully reviewed the entire record before this Court, and thoroughly considered the argument and authority presented and have determined that the record is free of any error of law requiring reversal. The judgment and sentence of each defendant is accordingly, affirmed.

Pursuant to Rule 1.18, 22 O.S.Supp.1974, Ch. 18, App., the defendant is advised that any Petition for Rehearing herein must be filed with the Clerk of this Court within fifteen (15) days of the date upon which this opinion is filed therein.

BRETT, P. J., and BLISS, J., concur.

### APPENDIX

#### Selected Voir Dire Examination

"THE COURT: . . . This is a first degree murder case, and the penalty for first degree murder under the laws of the State of Oklahoma is that any person who, if convicted of murder in the first degree, shall suffer death.

There are crimes that you may try as a Juror up here where there is a reign of punishment, but in murder in the first degree, the laws of this state is that it is the death penalty. . . . [T]he burden of proof is on the State of Oklahoma to prove a Defendant guilty beyond a reasonable doubt. If the State proves to your satisfaction beyond a reasonable doubt that the Defendants are guilty of murder in the first degree, it would be your duty to find the Defendants guilty of murder in the first degree. Would each of you do that as your sworn duty as Jurors?

If anyone who would not, please hold up your hand?

MRS. ANGEL: That would apply to capital punishment, wouldn't it?

THE COURT: I will get to that in a moment. . . .

As I told you a moment ago, ladies and gentlemen, in this type of case there is only one punishment under the laws of the State of Oklahoma for murder in the first degree, that is that the Defendant or Defendants shall suffer death. And it would be your duty, if you found them guilty beyond a reasonable doubt under the law, in the case to assess the punishment in the case, and there being only one punishment. . . .

* * * * * *

THE COURT: Mrs. Angel, do you understand the nature of the case that is on trial before this Jury today?

MRS. ANGEL: Yes.

THE COURT: Do you understand what I have told you about the punishment for first degree murder is by the laws of this state?

MRS. ANGEL: Yes.

THE COURT: Mrs. Angel, in a case where the law and the evidence warrants, in a proper case, could you without doing violence to your conscience, agree to a verdict imposing the death penalty?

MRS. ANGEL: No, sir.

THE COURT: You couldn't?

MRS. ANGEL: No.

MR. HARRIS: We challenge the Juror for cause.

THE COURT: Juror has been challenged for cause. What says Mr. Leatherman first?

MR. LEATHERMAN: I don't think that is any cause, Your Honor.

THE COURT: I'll ask the Juror one other question. Mrs. Angel, I take it you have reservation about the death penalty?

MRS. ANGEL: Yes.

THE COURT: Personal reservations?

MRS. ANGEL: Personal reservations only.

THE COURT: Please listen to me very closely, are your reservations about the

death penalty such that regardless of the law, the facts, and the circumstances of the case, you could not inflict the death penalty if you found beyond a reasonable doubt that the Defendants or either of them were guilty of murder in the first degree? Do you understand what I am asking you?

MRS. ANGEL: I would have to go along with the law, but regardless of the law, did you say?

THE COURT: Well, you understand, Mrs. Angel, if the State fails to prove the Defendants guilty beyond a reasonable doubt, it would be your duty along with the other Jurors to find the Defendant not guilty.

MRS. ANGEL: Right.

THE COURT: But if the State proved to your satisfaction and the other members of the Jury beyond a reasonable doubt that the Defendant or Defendants or either of them are guilty of murder in the first degree, the law of this state provides only one punishment, that is death. And so what I am asking you is, irrespective of that law, are the facts and circumstances of the case, is your reservations about your feelings about the death penalty such that irrespective of the facts of the case, are you saying that you could not vote for a penalty of death?

MRS. ANGEL: No, I think I am saying it would be difficult, but I would go ahead if beyond a reasonable doubt.

THE COURT: Then you could impose it if you found the facts to be such? You could do that?

MRS. ANGEL: Yes, if my conscience

- - -

THE COURT: I won't excuse the Juror for cause at this time. [Tr. 15–22]

* * * * * *

THE COURT: Mr. Hall, do you understand the nature of this case?

MR. HALL: I do.

THE COURT: And do you understand the explanation I have made about what type of case it is, and it is a case where the Defendants are charged with murder in the first degree?

MR. HALL: Yes.

THE COURT: Mr. Hall, let me ask you this further question; I take it that you have personal or other reservations about the death penalty?

MR. HALL: Yes, sir.

THE COURT: All right. Are your reservations about the death penalty such that regardless of the law, facts, and the circumstances, of the case, you could not inflict the death penalty if you found beyond a reasonable doubt that the Defendant or either of them were guilty of murder in the first degree.

MR. HALL: I could not.

THE COURT: All right.

MR. HARRIS: We challenge him for cause, Your Honor.

THE COURT: Mr. Leatherman?

MR. LEATHERMAN: Object.

MRS. ASKINS: Object.

MR. JORDAN: Object, Your Honor.

THE COURT: All right, Mr. Hall, you will be excused for cause, you may step down, sir. Exceptions will be allowed both the Defendants by the ruling of the Court." [Tr. 25, 26]

* * * * * *

"MR. HARRIS: . . . Mrs. Angel, you just don't believe in the death penalty, do you?

MRS. ANGEL: I just find it hard to believe in the death penalty. I am sorry. You know it is an opinion, a personal opinion. I would comply with the duty, I would have to if I served on this Jury.

MR. HARRIS: In other words, as the Court has told you, these Defendants were charged with murder while committing an armed robbery. Oklahoma Statutes make that a death penalty offense."

* * * * * *

MR. HARRIS: Now, that being the case, you could put aside all your personal

beliefs about the death penalty if you found beyond a reasonable doubt these two men committed murder while engaged in an armed robbery, you could find them guilty of first degree murder, and assess the death death penalty, could you not?

MRS. ANGEL: I am going to revert to my first answer and say I am not sure, and I don't think I would be capable of serving on the Jury. I want to be fair, I really do. I don't want to get out of my duty, but I don't believe I could.

MR. HARRIS: You don't think you could serve on this Jury, you don't want to serve on this Jury feeling this type of case, do you? [sic]

MRS. ANGEL: I am sorry.

MR. HARRIS: We ask the Juror be excused for cause, Your Honor.

MR. LEATHERMAN: I object to it.

MRS. ASKINS: We object on the form on the form of the question, Your Honor. In proper voir dire question. The District Attorney attempts to draw his own - - -

THE COURT: Mrs. Angel, if I understand your answer to Mr. Harris, you don't believe, if the State proved to your satisfaction beyond a reasonable doubt that the Defendants while engaged in an armed robbery, committed murder in the first degree, that you could not vote the death penalty; is that correct?

MRS. ANGEL: I would vote the death penalty, but it would upset me. You said would it do violence to my conscience, I think it would, I am trying to be fair.

THE COURT: But if you found the facts to be such in this particular case?

MRS. ANGEL: I would. I would feel it my duty, I would have to, if I were on the Jury, yes, I would.

THE COURT: You understand if you should find, that is up to you as a Juror, I am not suggesting what you find, but should you find as a Juror these Defend-

ants are guilty of murder in the first degree, that the punishment for it is death, you understand that?

MRS. ANGEL: Yes.

THE COURT: And if you found them guilty as Mr. Harris has asked you, would you and could you vote for the death penalty?

MRS. ANGEL: I would find it very hard, I will be honest. No, I don't believe I could.

THE COURT: You don't believe you could.

MRS. ANGEL: No, I don't believe I could. I am being completely honest.

THE COURT: You have answered me and Mr. Harris two or three different ways.

MRS. ANGEL: I know, I am trying to assess myself.

THE COURT: I want you to think about it. I want you to express your true and honest convictions about this matter.

MRS. ANGEL: I am trying to ask myself whether I will be able to do such, and I am not sure I would be able to, so I think the only fair thing for me to do, I perhaps won't be able to in all conscience vote for the death penalty.

THE COURT: Irrespective of the facts? I'll excuse the lady for cause, and Defendants, both Defendants, will be given an exception to the ruling.

MRS. ASKIN: Defendant Williams objects.

THE COURT: I have noted your objection, and given you an exception to the ruling." [Tr. 37–40]

## OPINION ON REHEARING

BUSSEY, Judge:

Upon petition for rehearing, the appellants in part contend that this Court erred in the decision previously rendered herein on September 17, 1975, regarding the constitutionality of 21 O.S.Supp.1974, §§ 701.5

and 701.6.[1] Appellants assert that by failing to ascertain and give effect to the intention of the Legislature as clearly expressed in those statutes our interpretation defeated the Legislative intent and was not in accord with fundamental rules of statutory construction. Conceiving our holding to have turned upon those statutes being fatally vague and uncertain regarding the conduct of the evidentiary hearing contemplated therein, the appellants argue that procedural implementation of that hearing could readily be accomplished within the rule making authority of this Court. This interpretation misconstrues the basis for our decision regarding the constitutionality of those statutes but justifiably demonstrates the need for clarification of that aspect of our prior opinion.

■■ Unlike many other states which sought to retain some discretion in the sentencing process,[2] the Oklahoma Legislature pursued the extreme approach necessary to curb the unbridled discretion condemned in *Furman*,[3] and eliminated that discretion for the crime of first degree murder by making the death penalty mandatory upon conviction for that offense. The Legislature desired to employ a scheme of capital punishment in the enforcement of First Degree Murder but was undoubtedly and understandably in a quandary as to how to comply with *Furman*. Rather than attempting to establish standards or guidelines for the imposition of the death penalty under the very uncertain requirements of *Furman*, the Legislature adopted this approach in a diligent effort to assure compliance with that decision. Our statutes upon appellate review purport to confer upon this Court the authority to modify a death sentence to life imprisonment when that sentence is *discriminatory* or *disproportionate*. The decision in *Furman* turned upon discriminatory and disproportionate imposition of the death penalty under mercy statutes then in existence. Our statutes upon appellate review were therefore aimed directly at the crux of that decision. Even in other states retaining some discretion in the sentencing procedure, quite similar provisions upon appellate review have been adopted in an effort to comply with *Furman*. See, *Coley*, and *People ex rel. Rice*, infra. We are therefore persuaded that the Oklahoma Legislature adopted these statutes upon appellate review of the death sentence in an effort to insulate or protect an otherwise mandatory scheme of capital punishment against any deficiencies that might enter the system and result in further constitutional

---

1. Title 21 O.S.Supp.1974, §§ 701.5 and 701.6, respectively, are as follows:
 "The Court of Criminal Appeals when reviewing a judgment and sentence of death shall, in the first instance, determine whether errors of law occurring at trial require reversal or modification, but if the Court shall determine that there are no errors of law in the record requiring reversal or modification, the Court shall then convene for the purpose of reviewing the sentence of death. The Court shall set a date certain for an evidentiary hearing, the purpose of which will be to determine if the sentence of death comports with the principles of due process and equal protection of the law. Upon the hearing the Court shall determine whether the sentence of death was a result of discrimination based on race, creed, economic condition, social position, class or sex of the defendant or any other arbitrary fact; and the Court shall specifically determine whether the sentence of death is substantially disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." "Should the Court determine that the sentence of death is discriminatory or is substantially disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant, the Court shall modify the sentence of death to life in the penitentiary at hard labor."

2. See: Comment, Discretion and the Constitutionality of the New Death Penalty Statutes, 87 Harv.L.Rev. 1690 (1974); *State v. Dixon*, Fla., 283 So.2d 1 (1973); *Jurek v. State*, 522 S.W.2d 934 (Tex.Cr.App.1975); *Coley*, infra; and, *People ex rel. Rice*, infra.

3. See, consolidated cases of *Furman v. Georgia*, *Jackson v. Georgia*, and *Branch v. Texas*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), hereinafter cited by reference to the lead case.

challenge, and did not intend that these statutes should operate as mercy provisions. If the intent of the Legislature had been otherwise, we are persuaded that they would have prescribed specific conditions to be considered just as other states which have endeavored to retain controlled discretion, rather than adopting these general provisions couched in terms of the ultimate evil at which *Furman* was directed. However, we are of the further opinion that in this endeavor the Legislature misconceived the propriety and necessity of appellate modification upon such criteria under a mandatory scheme of capital punishment.

 As the Legislature resolved to otherwise mandate but one punishment for first degree murder, appellate modification upon the vague and indefinite criteria that "the sentence of death . . . is substantially disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant," would be tantamount to this Court exercising the unguided sentencing discretion previously extended to the jury or trial court under the mercy statutes condemned in *Furman*. See, *People ex rel. Rice,* infra. Any attempt by this Court to delineate Legislative intent from this uncertain criteria would be equivalent to substantive legislation and not within our rule making authority. Under this criteria we are left hopelessly in doubt as to the meaning of "similar cases." To illustrate, we are first left to speculate upon whether that phrase encompasses only murder convictions or extends so far as to include all homicide cases which might have resulted in murder convictions, and whether this language embraces only cases appealed to this Court or all cases prosecuted in the trial courts below. Further, we could not draw a comparison to cases preceding *Furman* under our prior mercy statute since the punishment in those cases was imposed under the same discretionary sentencing statute held unconstitutional by *Furman*. Such a comparison would simply perpetuate the very discrimination found to exist in that decision.

Reference to only those cases wherein this Court previously affirmed the murder conviction but modified the death sentence to life imprisonment would have the same effect since we there exercised that authority in light of the disposition of other cases prosecuted under the mercy statute. We certainly could make no comparison to cases subsequent to *Furman* but prior to the enactment of our present statute since life imprisonment was then the only punishment for murder. With the enactment of our current legislation, the death penalty is now otherwise mandatory for selected categories of homicide. Insofar as cases arising under a comparable scheme of enforcement, we are therefore without "similar cases" upon which to base a valid comparison. Although quite similar provisions upon appellate review were upheld in *Coley v. State*, 231 Ga. 829, 204 S.E.2d 612 (1974), and seemingly held valid in *People ex rel. Rice,* infra, these cases are distinguishable since the legislation involved therein retained such discretion in the sentencing process that there would arguably be similar cases upon which to formulate a comparison.

 Moreover, any attempt by this Court to delineate standards or guidelines under the foregoing criteria would be inconsistent with what we deem to have been the actual purpose of the Legislature in enacting these provisions. Since we have concluded that these statutes were adopted as insulating or protective measures for an otherwise mandatory scheme of capital punishment and were not intended to operate as mercy provisions, disproportionate sentencing not caused by discrimination would only occur when the evidence was insufficient to sustain the verdict. As there is now but one penalty for first degree murder in this State, the appropriate inquiry for this Court is whether a conviction in such cases is consistent with the law. Where the evidence is insufficient to sustain a conviction for first degree murder but clearly sufficient to otherwise support a conviction upon a lesser included of-

fense, modification of the judgment to the statutory range of punishment for the included offense would be an appropriate consideration under the more general authority conferred upon this Court by the provisions of 22 O.S.1971, § 1066. In such a case the necessity for modification is presented as a matter of law rather than as a mere discretionary determination by this Court. As previously observed, this Court is otherwise without authority to modify a sentence below the minimum punishment established by the statutory provisions governing the particular crime involved. See, *Griffith v. State*, Okl.Cr., 516 P.2d 1348 (1973), and *Meeks v. State*, Okl.Cr., 501 P.2d 887 (1972). Also, modification by this Court must be the exercise of a judicial power as an award of justice, as distinguished from the executive power of clemency vested in the governor to commute, reprieve, pardon or parole, as an award of grace. See, *Parish v. State*, 77 Okl.Cr. 436, 142 P.2d 642 (1943), and *Harvell v. State*, 97 Okl.Cr. 97, 258 P.2d 702 (1953).

■■■ Discriminatory application of the death sentence is the only other basis for modification under these statutes. We are of the opinion that a new trial is the necessary and proper remedy in such cases insofar as any discrimination may be thereby remedied. Discrimination arising during the trial of a case could only result in the trier of fact failing to deliberate impartially upon the defendant's guilt of first degree murder or refusing to give due consideration to a lesser included offense since assessment of the death penalty is otherwise mandatory. In either case reversal for a new trial rather than modification would be necessary to preserve the defendant's right to a fair and impartial trial. Additionally, when such discrimination may be remedied by reversal for further prosecution, modification of the death sentence as a remedy would operate to introduce discrimination of the nature condemned in *Furman* against others lawfully convicted of first degree murder since capital punishment is otherwise mandatory for that offense in this State. If in any particular case an accused is discriminatorily charged with first degree murder, a different situation would be presented since reversal for further prosecution on that charge would not operate as a remedy, however, neither might modification to life imprisonment cure the error depending upon the nature of the discrimination. Since such a case would have to be resolved upon the basis of the particular facts presented, we are of the opinion that further discussion thereof should be deferred to an appropriate case.

■■ In view of the foregoing considerations and because the evidentiary hearing contemplated by these statutes before this Court is duplicitous to established procedure for the presentation of evidence before the trial court upon any legal issue, we are of the opinion that such a hearing would be a vain and needless task which we cannot presume the Legislature to have intended. For the foregoing reasons and to the extent herein discussed, we are therefore of the opinion that these statutes are unconstitutional.

Appellants also contend that the severability clause enacted along with the bill adopting 21 O.S.Supp.1974, § 701.1 et seq.,[4] cannot be invoked to sever the unconstitutional provisions of §§ 701.5 and 701.6 from the remaining portions of that enactment since we cannot presume that the Legislature would have passed that bill without fully incorporating the provisions now held to be unconstitutional.

This proposition presents primarily a question of Legislative intent. In the second and third paragraphs of the Syllabus to *Englebrecht v. Day*, 201 Okl. 585, 208 P.2d 538 (1949), the following appears:

"The unconstitutionality of a portion of an Act of the Legislature does not defeat or affect the validity of the remain-

---

4. See, H.B. No. 1101, Okl.Sess.Laws 1973, Ch. 167.

ing provisions unless it is evident that the Legislature would not have enacted the valid provisions with the invalid provisions removed, if with the invalid provisions removed the rest of the Act is plain and fully operative as law.

"The effect of a provision in an Act of the Legislature that the invalidity of any sentence, clause or provision in the Act shall not affect the remaining portions, is to create a presumption that, omitting the unconstitutional portions, the remaining portions would have been enacted by the Legislature."

Also see, *State ex rel. Roth v. Waterfield*, 167 Okl. 209, 29 P.2d 24 (1934), and *Sterling Refining Co. v. Walker*, 165 Okl. 45, 25 P.2d 312 (1933).

In support of this proposition the appellants cite *People ex rel. Rice v. Cunningham*, Ill., 336 N.E.2d 1 (1975). Following conviction for murder but prior to sentencing, the statute there under consideration directed that a three judge court be convened for the purpose of hearing evidence and determining whether that crime was committed under circumstances enumerated in the statute. If a majority of that court determined such circumstances to have existed, then the accused was to be sentenced to death unless a majority of the judges also found that there were "compelling reasons for mercy." The court there held the mercy clause to contain inadequate standards or guidelines, and further held the legislative creation of this three judge court and another provision directing an appeal of capital cases to an intermediate appellate court to be violative of specific State constitutional provisions. In so holding the court concluded:

"In summary, we hold invalid the provision of the death penalty statute pertaining to the impaneling of a three-judge court, the provision relating to the exercise of 'compelling reasons for mercy' which would obviate the imposition of the death penalty and the provision establishing the appellate review procedure for one sentenced to death. The provi-

sions that we have held unconstitutional are so connected and dependent upon one another as to warrant the belief that the legislature would not have passed the remaining portions of the statute independent of these. Consequently, the invalid sections may not be severed. . . . The imposition of the death penalty under this statute is improper, . . ."

We are of the opinion that case is readily distinguishable, however, since the intent of the Legislature could obviously not be implemented with the invalid provisions removed. In response to *Furman*, the Illinois Legislature clearly endeavored to retain discretion in the sentencing process and did not intend to adopt a mandatory scheme of capital punishment. The Legislature there intended that only those within the statutory categories and not within the purview of the mercy·clause suffer death, and that these determinations be made by a majority of a three judge court specially convened after conviction but before sentencing. A procedure for appellate review of the death sentence quite similar to our own was established since discretion would be exercised in every case under the mercy clause. The invalidity of the mercy clause and the unconstitutionally conceived three judge court prohibited implementation of that sentencing procedure so as to effectuate legislative intent.

In contrast, the Oklahoma Legislature adopted a mandatory scheme of capital punishment and eliminated discretion in the sentencing procedure for the crime of first degree murder. Similar provisions upon appellate review of the death penalty were adopted as a protective measure against further constitutional attack upon an otherwise mandatory scheme of enforcement and were not intended to operate as mercy provisions. We would therefore frustrate the intent of the Legislature by holding the invalid aspects of these insulating provisions inseparable from the remaining provisions. Additionally, the contention of the appellants fails to give appropriate significance to the intention of the Legislature as embodied in the accom-

panying severability clause, and the presumption arising therefrom that the Legislature would have enacted the valid provisions omitting the unconstitutional aspects of the other provisions. The conclusion is not evident that the Legislature would have refused to enact the valid provisions with the unconstitutional aspects of the other provisions removed, and the Act is otherwise fully operative. We are therefore of the opinion that this proposition is without merit.

Appellants further contend that our holding with respect to appellate review and modification of the death sentence under 21 O.S.Supp.1974, §§ 701.5 an 701.6, so alters the consequences of conviction for a capital offense to their disadvantage that constitutional provisions against ex post facto laws [5] require prospective application of the death penalty only.[6] While conceding that the rationale for constitutional ex post facto provisions has been read into the due process clause as a limitation upon the effect of judicial construction, see *Bouie v. Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), the State points out that constitutional prohibitions against ex post facto law operate directly only as a restraint upon legislative powers.[7]

■ In the early decision of *Calder v. Bull*, 3 Dall. 386, 1 L.Ed. 648, 650 (1798), the United States Supreme Court first defined ex post facto laws as follows:

" . . . 1st. Every law that makes an action done before the passing of the law; and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3rd. Every law that

changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender. . . ."

Generally, an ex post facto law has been defined as any law passed after the commission of an offense, which in relation to the offense or its consequences, alters the situation of an accused to his disadvantage. See: *Kring v. Missouri*, 107 U.S. 221, 2 S.Ct. 443, 27 L.Ed. 506 (1883); *In re Medley*, 134 U.S. 160, 10 S.Ct. 384, 33 L.Ed. 835 (1890), and, *Rooney v. North Dakota*, 196 U.S. 319, 25 S.Ct. 264, 49 L.Ed. 494 (1905).

■ Our statutory scheme of capital punishment was enacted and fully effective prior to the commission of the instant offense. These provisions clearly define the subject offense to constitute first degree murder and made the imposition of the death penalty mandatory upon conviction. The statutes upon appellate review of the death sentence purported to confer modification authority upon this Court only to the extent that the death sentence was discriminatory or substantially disproportionate. Clearly, our decision upon the constitutionality of those provisions did not increase the severity of the punishment for first degree murder since the death penalty was mandatory unless modification was necessary as therein contemplated. Furthermore, unless the death penalty in any particular case was the result of discrimination or substantially disproportionate, an accused convicted of first degree murder

5. See, U.S.Const., art. I, § 10, cl. 1, and Okla.Const., art. II, § 15.

6. Appellants cite in support of this proposition: *Kring v. Missouri*, infra; *Thompson v. Utah*, 170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061 (1898); *Lindsey v. Washington*, 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937); *Bouie v. Columbia*, infra; *State v. Dickerson*, Del.Supr., 298 A.2d 761 (1972);

and, *State v. Waddell*, 282 N.C. 431, 194 S.E.2d 19 (1973).

7. See: *Ross v. Oregon*, 227 U.S. 150, 33 S.Ct. 220, 57 L.Ed. 458 (1913); *Frank v. Mangum*, 237 U.S. 309, 35 S.Ct. 582, 59 L.Ed. 969 (1915); and, *United States v. Rundle*, 383 F.2d 421 (3rd Cir. 1967), cert. denied 393 U.S. 863, 89 S.Ct. 144, 21 L.Ed.2d 131.

could not seek modification under those provisions since they did not otherwise purport to confer such power upon this Court.

■■■ There is a total absence of any indication whatsoever that the death penalty was discriminatory in this case and under the facts and circumstances presented that sentence was in no sense disproportionate. The evidence was clearly sufficient to support the conclusion of the jury that while acting in concert the appellants killed Cherry Lee Kennedy with premeditation during the commission of an armed robbery. The record further indicates that the crime was perpetrated unmasked late at night while the victim was alone, and she was brutally shot and killed despite her lack of resistance to the robbery. In view of the verdict of the jury, we are therefore persuaded from our examination of the record that the victim was killed incident to a previously conceived plan to eliminate her as a witness to the robbery. The value the appellants placed upon the life of Ms. Kennedy is illustrated by reference to the fact that the robbery grossed them about $32.00 and two cartons of cigarettes and necessitated the disposal of a gun costing $30.00. Appellant Williams admitted prior felony convictions for embezzlement and a federal auto theft violation, and appellant Justice admitted prior felony convictions for second degree forgery and attempted auto larceny. Further, in *Justus v. State*, Okl.Cr., 542 P.2d 598 (1975), this Court recently affirmed the conviction of appellant Justus for first degree murder committed three weeks prior to the instant offense while perpetrating another armed robbery. Therefore, if the scheme of capital punishment adopted by the Oklahoma Legislature is to have any efficacy the death penalty cannot in any manner be here considered disproportionate, irrespective of our present decision regarding the provisions upon appellate review. However, we are fortified by our conclusion that the Legislature did not intend for these statutes to act as mercy provisions but rather adopted

them as protective measures to insulate an otherwise mandatory scheme of capital punishment against further constitutional challenge under *Furman*.

■■■ Since the appellants are clearly not among the class of persons within the purported ambit of the provisions upon appellate review, this Court would not have had the authority to modify the death sentences in this case had those statutes been fully valid. Consequently, our interpretation of those provisions and decision upon their constitutionality did not restrict the possible range of punishment applicable to the appellants. Nor did our holding thereupon alter the situation of the appellants to their disadvantage in relation to the offense or its consequences. The cases cited by appellants are upon this basis clearly distinguishable. We therefore conclude that our decision herein upon the provisions for appellate review of the death sentence did not operate as an ex post facto law against the appellants nor deny them due process of law, and hold this proposition to be without merit.

■■■ In this regard appellant Justus also argues that our decision upon the appellate review provisions deprived him of an opportunity to establish that the death sentence was discriminatory or disproportionate. Subsequent to the issuance of our interim opinion herein, the evidentiary hearing contemplated by these statutes was set for hearing with notice of nearly one month. Not until the day prior to that hearing did appellant Justus present this Court with a motion that we establish guidelines for the review of death sentences under those provisions, and appellant Williams filed an identical motion the day of that hearing. The appellants then argued those motions at that hearing but the purpose of the hearing was frustrated since no evidence whatsoever was presented. Neither did the appellants endeavor to establish that the death sentences were discriminatory or disproportionate when the present petitions for rehearing were heard by this Court. Our prior decision express-

ly did not limit the right of the appellants to present a motion for new trial based upon newly discovered evidence nor preclude appellants from seeking any appropriate post conviction relief. We are therefore of the opinion that this contention is untenable. Other propositions raised by appellant Justus were first presented in his original brief and fully considered in our previous decision.

For the above and foregoing reasons, the decision previously rendered herein is *reaffirmed*, the order of this Court staying execution of sentence pending appeal is set aside, and the Clerk of this Court is therefore directed to issue mandate forthwith.

The date originally appointed for the execution of the appellants having passed pending this appeal, it is further ordered, adjudged and decreed that each judgment and sentence appealed from be carried out by the electrocution of the appellants, Bobby Joe Williams and Allen Clayburn Justus, by the Warden of the State Penitentiary at McAlester, Oklahoma, on Monday, February 23, 1976.

BRETT, P. J., and BLISS, J., concur.